SK:ADW/TBM
F. #2021R00370 / OCDETF#NY-NYE-0906

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF FOUR PREMISES, INCLUDING ANY CLOSED OR LOCKED CONTAINERS THEREIN, SIX PERSONS AND CERTAIN CELLULAR PHONES | **APPLICATION FOR SEARCH WARRANTS**<br><br>No. 22-MJ-45 |

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR
WARRANTS TO SEARCH AND SEIZE**

I, SCOTT SALAMON, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for warrants to search the premises known and described as:

(1) 14 Argyle Road, Westbury, New York 11590 (the "Costa Premises"); (2) 102-15 Dunton

Court, Howard Beach, New York 11414 (the "Stash House Premises"); (3) 94-49 109th Avenue,

Ozone Park, New York 11417 (the "Cafaro Premises"); and (4) 252 Jericho Turnpike, Westbury,

New York 11590 (the "Eichenauer Premises") (collectively, the "SUBJECT PREMISES"),

further described in Attachments A-1 to A-4, respectively, for the things described in

Attachments B-1 to B-4, respectively.  I also make this affidavit in support of warrants to search

the persons of: (i) ARCANGELO CAFARO (DOB: March 14, 1976); (ii) JOSE COSTA (DOB:

November 7, 1979); (iii) RICARDO DIAZ (DOB: July 19, 1980); (iv) EDMUND

EICHENAUER (DOB: June 23, 1979); (v) GEORGE EICHENAUER (DOB: May 5, 1978); and

(vi) JAY SANCHEZ (DOB: March 10, 1987) (collectively, the "SUBJECT PERSONS"), as

further described in Attachments A-5 to A-10, respectively, for the things described in Attachments B-5 to B-10, respectively.

2.      I am a Special Agent with the United States Department of Homeland Security, Homeland Security Investigations ("HSI").  I have been an HSI Special Agent since 2006 and am currently assigned to the Violent Crimes and Narcotics Unit, where I investigate violations of the Controlled Substances Act and various related statutes.  During my tenure with HSI, I have been involved with investigations of Title 21 offenses and have participated in numerous investigations of narcotics trafficking, during which I have (a) conducted physical surveillance, (b) executed search warrants, (c) debriefed cooperating witnesses and victims, (d) reviewed and analyzed numerous taped conversations of those engaged in narcotics trafficking and money laundering activities, and (e) monitored wiretapped conversations and reviewed line sheets prepared by wiretap monitors.  Through my training, education and experience, I have become familiar with the manner in which narcotics trafficking schemes are carried out, and the efforts of persons involved in such activity to avoid detection by law enforcement.

3.      This affidavit is based upon my participation in the investigation, my examination of reports and records, and my conversations with other law enforcement agents and other individuals.  Because this affidavit is being submitted for the limited purpose of obtaining the requested warrants, it does not include all of the facts that I have learned during the course of this investigation.  Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise

indicated.  Where dates are reported, they are reported on or about the specific date.  Where times are reported, they are reported in approximations.

4.  For the reasons set forth below, I respectfully submit that probable cause exists to believe that inside the SUBJECT PREMISES and on the SUBJECT PERSONS exist evidence, contraband, fruits and instrumentalities of federal criminal offenses, including violations of Title 21, United States Code, Sections 841 and 846 (narcotics trafficking and conspiracy to traffic narcotics) and Title 18, United States Code, Section 1956 (money laundering) (collectively, the "Subject Offenses").

5.  As set forth below, the SUBJECT PERSONS operate and assist a drug trafficking organization—the Costa Organization—which operates out of Queens and Long Island, New York, and distributes retail and wholesale quantities of cocaine to customers in the New York area and surrounding states.  The Costa Organization has obtained millions of dollars in proceeds from its cocaine sales, which proceeds were used to purchase real estate and luxury vehicles, among other things.  The SUBJECT PERSONS and other members and associates of the Costa Organization have used the SUBJECT PREMISES, and cellular telephones, to carry out their narcotics trafficking activities.

## THE PREMISES, PERSONS, AND DEVICES

6.  The Costa Premises—14 Argyle Road, Westbury, New York 11590—is a two-story, single-family home with a green roof, a front door framed by four white pillars, and an attached two-car garage.  The Costa Premises is further described in Attachment A-1.

7.      The Stash House Premises is the lowest-level residential unit of the two-story, two-family home located at 102-15 Dunton Court, Howard Beach, New York 11414, accessible through a side door entrance that is located about halfway down the driveway.  The home has two white front doors that are accessible by a concrete stairway of about six to seven steps, and the numbers "10215" can be seen on the building, directly above the two front doors.  The Stash House Premises is further described in Attachment A-2.

8.      The Cafaro Premises—94-49 109th Avenue, Ozone Park, New York 11417—is a two-story, single-family brick home with a dark brown front door, a storm door, the numbers "9449" mounted on the brick façade to the left of the front door, and a concrete stairway of about four to five steps leading to the front door.  The Cafaro Premises is further described in Attachment A-3.

9.      The Eichenauer Premises—252 Jericho Turnpike, Westbury, New York 11590— is a two-story, single-family brick home.  Facing the residence from Jericho Turnpike, there is a partial gravel driveway to the right of the home.  The front lawn of the home has several trees and bushes.  The Eichenauer Premises is further described in Attachment A-4.

10.     ARCANGELO CAFARO is a 45-year-old male citizen of the United States who resides at the Cafaro Premises.  CAFARO is further described in Attachment A-5, which also includes a photograph of CAFARO.

11.     JOSE COSTA is a 42-year-old male citizen of the United States who resides at the Costa Premises.  COSTA is further described in Attachment A-6, which also includes a

4

photograph of COSTA.

12.     RICARDO DIAZ is a 41-year-old male citizen of the United States who resides within the Eastern District of New York.  DIAZ is further described in Attachment A-7, which also includes a photograph of DIAZ.

13.     EDMUND EICHENAUER is a 42-year-old male citizen of the United States who resides at the Eichenauer Premises.  EDMUND EICHENAUER is further described in Attachment A-8, which includes a photograph of EDMUND EICHENAUER.

14.     GEORGE EICHENAUER is a 43-year-old male citizen of the United States who resides at the Eichenauer Premises.  GEORGE EICHENAUER is further described in Attachment A-9, which includes a photograph of GEORGE EICHENAUER.

15.     JAY SANCHEZ is a 34-year-old male citizen of the United States who resides in the District of Connecticut.  SANCHEZ is further described in Attachment A-10, which includes a photograph of SANCHEZ.

16.     This application also seeks authorization to seize particularly described types of electronic devices that may be found within the SUBJECT PREMISES and/or on the SUBJECT PERSONS, and to search such devices for particularly described categories of information.  The aforementioned devices and categories of information are further described below and in Attachments B-1, B-2, B-3, B-4, B-5, B-6, B-7, B-8, B-9 and B-10.

**PROBABLE CAUSE**

17.     As described further below, HSI has been investigating the SUBJECT PERSONS

and other individuals distributing cocaine in the Eastern District of New York and elsewhere, in

violation of the Subject Offenses.[1]  For the reasons set forth below, I respectfully submit that

probable cause exists to believe that a search of the SUBJECT PREMISES and the SUBJECT

PERSONS will yield evidence, fruits, contraband and instrumentalities of the Subject Offenses.

18.     In late 2020, HSI learned from a reliable cooperating witness (the "CW") that

DIAZ was a member of a drug trafficking organization, the Costa Organization, that was

distributing cocaine in Queens, New York.[2]  Through its investigation, law enforcement learned

that CAFARO, COSTA, and EDMUND EICHENAUER were also all members of the Costa

Organization, and that SANCHEZ regularly supplied cocaine to the Costa Organization.

19.     During the period between December 2020 and through 2021, at the direction of

law enforcement, the CW communicated with DIAZ via telephone calls and text messages to

arrange for narcotics transactions.  On numerous occasions during this period, the CW arranged

---

[1] On January 14, 2022, the Honorable Vera M. Scanlon signed a Complaint charging
CAFARO, COSTA, DIAZ, EDMUND EICHENAUER and SANCHEZ, among others, with
conspiracy to traffic narcotics, in violation of 21 U.S.C. §§ 846 and 841.  See 22-MJ-43.  The
Complaint is attached as Exhibit A and incorporated by reference herein.

[2] The CW is an individual who pled guilty in New York state court to narcotics offenses
and is cooperating in the hopes of receiving leniency at sentencing.  The CW has provided
reliable information in the past, much of which has been corroborated by consensually recorded
phone calls and text messages, law enforcement surveillance and other independent evidence.

to meet with DIAZ and/or an associate of DIAZ at one or more locations in Queens, New York to purchase cocaine.  In total, the CW purchased more than 500 grams of a white powdery substance as part of these transactions.  Each transaction was recorded and surveilled by law enforcement.  After each transaction, the CW provided the white powdery substance to law enforcement, and on each occasion, the substance later tested positive for cocaine.

20.    Between October 2021 and December 2021, the Honorable Rachel P. Kovner, United States District Judge, Eastern District of New York, issued orders authorizing the interception of wire and electronic communications occurring over cell phones used by COSTA, DIAZ and EDMUND EICHENAUER.  Law enforcement confirmed the identities of the users of the cell phones through subscriber records, surveillance, and communications during which the speakers identified themselves.  The intercepted communications, in combination with surveillance, revealed an extensive cocaine distribution operation and the locations of several properties where the Costa Organization appears to maintain narcotics and narcotics proceeds.

21.    In sum, the evidence revealed that COSTA is the leader of the Costa Organization, procuring wholesale quantities of cocaine from several different suppliers, including SANCHEZ, who supplies the Costa Organization with cocaine from Mexico.  COSTA and other members of the Costa Organization—including DIAZ, EDMUND EICHENAUER, GEORGE EICHENAUER and CAFARO—then personally sell that cocaine to customers in and around the New York area.  Both DIAZ and EDMUND EICHENAUER manage day-to-day operations: DIAZ maintains a schedule of when members of the Costa Organization, such as

7

CAFARO, will work selling cocaine and how much they earn during a given shift, and EDMUND EICHENAUER keeps records of the supply of drugs remaining in the stash house and the volume of sales conducted daily, in addition to collecting and distributing the narcotics proceeds.

<u>JOSE COSTA's Sourcing of Cocaine for the DTO</u>

22.     Intercepted communications show COSTA sourcing cocaine for the Costa Organization and SANCHEZ serving as one of the organization's suppliers.  During these communications, the defendants refer to kilograms of cocaine as "shits," among other code names.  For example, on or about November 12, 2021, COSTA and SANCHEZ had the following exchange during a phone call:

| | |
|---|---|
| SANCHEZ: | [. . .] he got a package, six of them shits came in and at twenty, usually charge for twenty-eight. |
| COSTA: | That's where I'm at, right now.  That's what I was telling you, last time. |
| SANCHEZ: | Yeah? |
| COSTA: | Everybody is there, bro.  That's why—that's why it's been dead, when you know—I still got those three here. |
| [ . . . ] | |
| COSTA: | I told you, you know what happened?  When all of that was stopped over there at the border, they—the farms don't stop.  You know what I'm saying? So . . . |
| SANCHEZ: | Mm-hmm, mm-hmm. |

COSTA: The farms keep going.  So, now they're unloading everything.  And it's crazy.  It's—those right there, I've been dead, dead in the water.  I'm like, "damn."

[ . . . ]

COSTA: I was in the teens at one time, like nineteen, eighteen.

SANCHEZ: Oh yeah, yeah.  That thing, I was a kid when that was happening.

COSTA: That was in the 2000s.

SANCHEZ: Exactly.

COSTA: Early 2000s.

[ . . . ]

SANCHEZ: And they're pretty, and that's why I was like, "Oh yeah, he gonna like these shits."

COSTA: Yeah.  [U/I]

SANCHEZ: Them shits even got the—them shits got the, the fucking newspaper from—

COSTA: Yeah, I believe you.

SANCHEZ: Mexico and shit.  You know what I'm saying.

COSTA: Yeah.  I believe you.  Um, just give me like a good two weeks, and then, I'm gonna fucking—and then [U/I]

SANCHEZ: You tell me what's up.

COSTA: Yeah, you know, I did—I'll do what I gotta do.  A good two weeks, I should have . . . at least most of it.

Based on my training and experience, as well as the information I have learned from this investigation, I understand the above conversation as follows: SANCHEZ told COSTA that SANCHEZ had six kilograms of cocaine that he purchased at $20,000 per kilogram; SANCHEZ and COSTA discussed the fact that wholesale prices of cocaine were unusually low because although street-level sales had been slow ("it's been dead"), cocaine was still entering the market from Mexico ("When all of that was stopped over there at the border, they—the farms don't stop . . . now they're unloading everything"); SANCHEZ informed COSTA that the cocaine he had for sale was packaged in Mexican newspapers; and COSTA told SANCHEZ he would likely be in a position to purchase the cocaine in approximately two weeks ("A good two weeks").

      23.     On November 15, 2021, at approximately 5:01 p.m., COSTA and SANCHEZ had the following exchange over an intercepted phone call:

| | |
|---|---|
| COSTA: | One of my boys just hit me for one of those. |
| SANCHEZ: | Okay.  When you want it?  Right now? |
| COSTA: | I'm trying to see him tomorrow you know, tomorrow.  Or—uh, you know? |
| SANCHEZ: | Tomorrow, could be—Nah, that's what Im' saying, I'll go—you already know I'll go over there early in the morning, I'll go . . . just drop it off.  [U/I] |
| COSTA: | You gotta come before the cleaning ladies come here.  Cuz they get here by—oh shit, I'm gonna have somebody here doing my floor.  Uh . . . |

SANCHEZ:        I'll see.  I might try—I might try to go today.  I'mma try to go today.  [U/I]

COSTA:          Try to make it today.  So, I can bang this guy out of the way before he goes somewhere else.

Based on my training and experience, and the information I have learned in this investigation, I understand the above conversation as follows: COSTA informed SANCHEZ he had found a customer for the cocaine SANCHEZ was trying to sell, and accordingly that COSTA wanted to buy the cocaine from SANCHEZ; COSTA asked SANCHEZ to deliver the cocaine to him that night, as opposed to the next day, when COSTA intended to see the customer, because COSTA was expecting that the next morning he would have cleaning people and an individual doing work on his floors in his home.

24.     Video surveillance showed that later in the evening on November 15, 2021, at approximately 11:30 p.m., SANCHEZ arrived at the Costa Premises.  SANCHEZ exited the car, leaned into the driver's side, retrieved an item from inside the car, and then walked through the garage door of the Costa Premises, which was open.  Approximately ten minutes later, SANCHEZ exited the garage door of the Costa Premises carrying a bag.  SANCHEZ walked to the driver's side door of his vehicle, leaned inside the driver's side area, and then entered the car. COSTA exited the garage door of the Costa Premises and walked to the front passenger's side of SANCHEZ's vehicle.  COSTA walked back through the garage door of the Costa Premises and the garage door closed.  SANCHEZ then drove away.

11

25.     On December 28, 2021, at approximately 10:16 a.m., SANCHEZ said the

following to COSTA during an intercepted phone call:

> SANCHEZ:        My fault, I didn't get to see you that day, man.  I crashed my jeep.
>                 That's why I haven't been hitting you up…
>
> [ . . . ]
>
> SANCHEZ:        I was gonna see you tomorrow, with the same shit.  You already
>                 know. [ . . . ]  So, I'll be there tomorrow

Based on my training and experience and the investigation to date, I understand the above

conversation as follows: COSTA and SANCHEZ agreed to meet on December 29, 2021, so that

SANCHEZ could deliver cocaine to COSTA.

26.     Video surveillance showed that the next day, on December 29, 2021, at

approximately 10:00 a.m., SANCHEZ left his residence carrying a black bag, entered a vehicle

parked in the vicinity, and drove out of view.  At approximately 10:16 a.m., SANCHEZ drove

back to his residence in the same vehicle.  At approximately 10:18 a.m., SANCHEZ exited the

vehicle while talking on a cell phone, opened the front passenger door, retrieved a weighted

down black bag from inside, and walked towards the front of his residence.  At approximately

10:20 a.m., while still talking on a cell phone, SANCHEZ walked out the front gate of his

residence, without a bag in hand, out of view.  At approximately 10:25 a.m., SANCHEZ walked

back towards the entrance to his residence, still on a cellular phone.  At approximately 10:40

a.m., SANCHEZ exited the front gate of his residence with a weighted down black bag and

entered the driver's seat of his vehicle, driving off.  At approximately 11:08 a.m., SANCHEZ

arrived at the Costa Premises and parked in the driveway.  SANCHEZ called COSTA at approximately 11:10 a.m., asking COSTA if he was "here" because SANCHEZ was "outside." SANCHEZ exited the car, opened the rear driver's side door, and appeared to be moving an object.  At approximately 11:13 a.m., SANCHEZ re-entered the driver's seat.  At the same time, the garage door of the Costa Premises and COSTA appeared.  SANCHEZ exited the vehicle, retrieved the weighted down black bag from the rear driver's side area and entered the garage. At approximately 11:25 a.m., SANCHEZ exited the garage carrying a green bag and a black bag, and entered the driver's seat of his vehicle.  At around the same time, DIAZ exited the garage of the Costa Premises, smoking a cigarette, and engaged in brief conversation with SANCHEZ before SANCHEZ drove away.  At approximately 11:50 a.m., SANCHEZ returned to his house. SANCHEZ retrieved the green bag and black bag from the car and entered his front door.

<u>The Costa Organization's Use of the Stash House Premises</u>

27.     The Costa Organization appears to store, process, and distribute narcotics from the Stash House Premises.  It also appears that COSTA manages both narcotics supplies and narcotics proceeds for the organization, and that he often works with EDMUND EICHENAUER in performing those tasks.

28.     As described in Attachment A-2, the Stash House Premises is limited to the lowest-level residential unit of the building that is accessible from a doorway located about halfway down the building's driveway.  Through surveillance, intercepted communications, and other records, I believe that the SUBJECT PERSONS have access only to the lowest-level

13

residential unit of the building (either at ground-level or basement-level), that the SUBJECT PERSONS are renting this unit, that the unit is exclusively accessible through the driveway doorway, and that the other residences within the building are not used by the SUBJECT PERSONS.[3]  I base this belief off of the following facts:

(a) During the course of this investigation, agents have surveilled the SUBJECT PERSONS entering and leaving the Stash House Premises only through the side door halfway down the driveway, and never through either of the front doors located at the top of the concrete stairway;

(b) During the course of this investigation, agents have observed several individuals entering and leaving the building through the two front doors located at the top of the concrete stairway, none of whom has been observed otherwise interacting with the SUBJECT PERSONS;

(c) Property listings for the building at 102-15 Dunton Court in Howard Beach indicate that the building contains two separate apartments on the first floor and the second floor, as well as a basement;

---

[3]  A publicly-accessible version of a floorplan for the entire building does not appear to be available on real estate or apartment rental websites.

(d) The pattern of various persons' uses of the two front doors and one side door of the building suggests that each door is designed to be a separate entrance to a separate residential unit;

(e) On October 28, 2021, EDMUND EICHENAUER told DIAZ on the phone that he had received a call from the landlord about the National Grid gas company needing access to the boiler room for the building, with EDMUND also reassuring DIAZ that the place was "super clean" and looked "like a regular apartment"; and

(f) Based on my experience, I know that boiler rooms are almost always located in the basement of residential buildings and that access to a boiler room is therefore located within or near the lowest-level unit or area of a residential building.

29.     Surveillance and intercepted communications showed a meeting at the Stash House Premises on November 21, 2021.  On that day, at approximately 11:51 a.m., EDMUND EICHENAUER called DIAZ and asked, "You around the block?"  DIAZ said, "Nah.  Call this kid.  He's home."  At approximately 12:03 p.m., EDMUND EICHENAUER arrived at the Costa Premises in his vehicle, parked in the driveway, and remained in the car.  At approximately 12:04 p.m., COSTA exited from the left garage door, which was already open, carrying a weighted black bag.  COSTA gave the bag to EDMUND EICHENAUER through the driver's side window and walked back into the garage.  EDMUND EICHENAUER exited the truck, opened the driver's side rear door, leaned in and appeared to be moving things inside, got back

15

into the driver's seat and drove away.  At approximately 12:43 p.m., video surveillance recorded EDMUND EICHENAUER walking towards the Stash House Premises.  At that time, EICHENAUER was carrying two weighted down bags—one black and the other a red and grey Target bag.  At approximately 1:14 p.m., EDMUND EICHENAUER called CAFARO and stated, "I'll be ready for you by two.  I just might not have everything ready.  I have something for you."  Based on my training and experience, as well as information gathered from this investigation, I understand this conversation as follows: EDMUND EICHENAUER informed CAFARO that EDMUND EICHENAUER would be done packaging drugs for sale by 2:00 p.m. At approximately 1:53 p.m. CAFARO arrived in the vicinity of the Stash House Premises and then walked to the stash house.  At approximately 2:14 p.m., CAFARO exited the driveway of the Stash House Premises carrying the weighted red and grey Target bag, got into a vehicle, and drove away.  At approximately 2:33 p.m., CAFARO arrived at the Cafaro Premises, removed the red and grey Target bag from the back seat and walked into his residence.

30.     Based on wire communications intercepted over a cell phone used by DIAZ, I believe that the Costa Organization uses passcode-protected safes, lockboxes, and similar security measures to store and safeguard narcotics and narcotics proceeds.  For example, on November 9, 2021, at approximately 6:13 p.m., CAFARO called DIAZ and had the following exchange:

CAFARO:          Rick, what's the number?

DIAZ:             Seven, two, one, nine, nine.

CAFARO:          [BACKGROUND BEEPING] Seven, two, one, nine, nine. [BACKGROUD NOISE] A'ight.  Bottom, right?

DIAZ:          Yeah.

Similarly, on November 23, 2021, DIAZ and CAFARO spoke on the phone, and CAFARO against asked, "what's the number."  DIAZ responded, "seven, two, one, nine, nine."  Based on my training and experience and the information I have learned from this investigation, I understand both of these conversations as follows: CAFARO asked DIAZ for the passcode to access a safe or similar security device.  Indeed, during the November 9, 2021 conversation, CAFARO appeared to be entering the passcode into a keypad while he was on the phone with DIAZ, and he then appeared to ask DIAZ to confirm that drugs or proceeds that CAFARO needed to retrieve were on the "bottom" portion of the safe.

31.     On November 24, 2021, COSTA called EDMUND EICHENAUER and they had a conversation regarding narcotics supplies at the Stash House Premises, as follows:

COSTA:          Nigga.  It might pop today.  There is a few things [audio breaks]

EDMUND:          I left . . . uh, you got five things pucked.  He's got five pucked and you got a full pack for tomorrow.  So . . .

COSTA:          A'ight.  Yeah.  It might, a puck . . .

EDMUND:          And I'm around.  I'll be home by over there, you know by you guys.  So, if anything . . .

COSTA:          Oh.  Oh, a'right.  No, I [U/I].

[ . . . ]

EDMUND:          Right.  Right.  'Cause, um, tomorrow it's usually, usually a good day on Thanksgiving, right?

17

| COSTA: | Yeah, usually . . . no like these last, like yesterday it popped for me a little something, so . . . |
| EDMUND: | Yeah. |
| COSTA: | So . . . you know.  They might come tomo—they might come today or a few days after. |

Based on my training and experience, and the information I have learned in the investigation to date, I understand the above conversation as follows: EDMUND EICHENAUER informed COSTA how much cocaine COSTA had left at the Stash House Premises ("five things pucked" and a "full pack") and that GEORGE EICHENAUER also had ("five things pucked");[4] COSTA indicated that Thanksgiving was sometimes a busy period ("It might pop today") and that it had been quite a busy day of sales the day prior ("yesterday it popped for me a little").

32.     On November 26, 2021, EDMUND EICHENAUER and COSTA again discussed the management of drug supplies.  On that day, the two men had the following conversation over an intercepted phone call:

| COSTA: | What we looking like over there?  Your brother still has? |
| EDMUND: | Yeah, he's got a lot still. |
| COSTA: | Oh. |

---

[4] During the course of this investigation, law enforcement has seized cocaine sold by the SUBJECT PERSONS.  That cocaine was uniquely packaged: either 100 grams of cocaine pressed into the shape of a hockey puck, or 50 grams of cocaine in the shape of a broken hockey puck.  Through this investigation, I have learned that the organization regularly packages cocaine in this way.

EDMUND:         I think he's got thirteen.  So. . .

COSTA:          God damn!

EDMUND:         Yeah.  So, slow, slow go for him this week.

[. . .]

COSTA:          We still good with that then.  This kid gave you, uh, Little Jo', everybody gave you everything?

EDMUND:         I have . . . yeah, I got some bread that was on your shelf in there.  It's like three or four diff. . . there's four different stacks.

COSTA:          A'ight.  Is Little Jo's there?

EDMUND:         I, I don't . . .

COSTA:          Oh, you don't know.

EDMUND:         Let me see if I see . . . if his names are on them shits.  I got Tank.

COSTA:          Uh-huh.

EDMUND:         Wednesday.

COSTA:          Wednesday, yeah.

EDMUND:         And then, the day before's bread, I believe.

COSTA:          Yeah, yeah.

EDMUND:         And then, there's a fourth stack in a plastic bag that looks like a lot.

COSTA:          Yeah, probably. . . Yeah, a'ight.  That's probably Lil Jo's.

EDMUND:         That must be Little Jo's, yeah.

COSTA:          A'ight.  I'm home.  Fucking . . .

EDMUND:              Yeah, I'll stop . . . I'm on the way.  So, I'll probably be there in
                     like fif . . . twenty minutes.

COSTA:               A'right, cool.  Come out.

Based on my training and experience, as well as the information I have learned from this

investigation, I understand the above conversation as follows: COSTA asked EDMUND

EICHENAUER about the supply of narcotics still in the possession of GEORGE EICHENAUER

(EDMUND's brother), and EDMUND EICHENAUER indicated that GEORGE EICHENAUER

still had a large supply left because of slow narcotics sales ("So, slow, slow go for him this

week"); COSTA and EDMUND EICHENAUER discussed narcotics proceeds stored at the Stash

House Premises, which the Costa Organization uses as a stash house to store narcotics and

narcotics proceeds, with specific reference to amounts earned on specific days and designated for

particular members of the Costa Organization.  Approximately 20 minutes after this phone call

concluded, video surveillance revealed that EDMUND EICHENAUER arrived at the Costa

Premises and parked in the driveway.  The garage door opened and EDMUND EICHENAUER

exited his car and entered the Costa Premises.  About one minute later, EDMUND

EICHENAUER exited the garage, closed the garage door, entered his car and then drove away.

  33. Law enforcement has observed EDMUND EICHENAUER travel to and from the

Eichenauer Premises while carrying what appears to be either narcotics or narcotics proceeds.

For example, on December 17, 2021, at approximately 10:10 a.m., agents observed EDMUND

EICHENAUER drive from the Eichenauer Premises to the Costa Premises.  At the Costa

Premises, EDMUND EICHENAUER spoke with DIAZ, who opened the passenger side door of

EDMUND EICHENAUER's vehicle and placed a brown bag inside.  At approximately 10:19 a.m., EDMUND EICHENAUER drove away from the Costa Premises, and at approximately 10:54 a.m., he arrived at the Stash House Premises.  EDMUND EICHENAUER then exited his vehicle while carrying a black bag and entered the Stash House Premises through the side driveway door.  At approximately 1:12 p.m., EDMUND EICHENAUER left the Stash House Premises, and at approximately 1:52 p.m., he was seen returning to the Eichenauer Premises, walking towards the entrance of the house while carrying a black bag.  Based on my training and experience and the information I have learned from this investigation, I believe that on December 17, 2021, EDMUND EICHENAUER retrieved narcotics or narcotics proceeds from DIAZ at the Costa Premises, went to the Stash House Premises to process and package narcotics, and then eventually returned to the Eichenauer Premises while carrying either narcotics or narcotics proceeds.

34.     On December 31, 2021, at approximately 2:21 p.m., EDMUND EICHENAUER and DIAZ had the following exchange over an intercepted phone call:

EDMUND:          Yo, I'mma come around and drop this butter.

DIAZ:            A'right, yeah, yeah.

EDMUND:          I'll call you when I'm out there, I'll be five minutes.

DIAZ:            A'right.  Yo, uh, so that was uh, yesterday's . . .

EDMUND:          And the day before, yeah.

DIAZ:             . . . and the day before?  Yeah, 'cause I was gonna pass by there, but then you read my mind.

Based on my training and experience, and the investigation to date, I understand the above conversation as follows: EDMUND EICHENAUER informed DIAZ that EDMUND EICHENAUER would be delivering to the Costa Premises the narcotics proceeds, which he referred to as "butter," from the past two days' sales.

35.     Video surveillance revealed that at approximately 2:24 p.m. on December 31, 2021, EDMUND EICHENAUER arrived at the Costa Premises in a black vehicle.  DIAZ exited the garage door of the residence and walked to the front passenger window of EDMUND EICHENAUER's car.  Afterward, EDMUND EICHENAUER drove away.  DIAZ then walked to his white vehicle, which was parked in the driveway of the Costa Premises, first opened and closed the front passenger door, then opened the driver's side door, leaned inside and closed the door.  DIAZ then re-entered the garage door of the Costa Premises.

36.     On January 12, 2022, law enforcement observed EDMUND EICHENAUER travel to and from the Eichenauer Premises in a manner consistent with him maintaining evidence of narcotics trafficking at the Eichenauer Premises.  On that day, at approximately 10:43 a.m., officers saw EDMUND EICHENAUER the Eichenauer Premises while carrying an item in his hand and drive away.  At approximately 11:22 a.m., officers observed EDMUND EICHENAUER arrive at the Stash House Premises and enter the building while carrying an item in his hand.  At approximately 12:44 p.m., officers saw EDMUND EICHENAUER leave the Stash House Premises with a gray bag and drive away.  At approximately 1:38 p.m., officers saw EDMUND EICHENAUER return to the Eichenauer Premises and enter the residence while

carrying a bag.  Based on my training and experience and the information I have learned from this investigation, I believe that on January 12, 2022, EDMUND EICHENAUER left the Eichenauer Premises while carrying narcotics or narcotics proceeds, went to the Stash House Premises to process and package narcotics, and then eventually returned to the Eichenauer Premises while carrying either narcotics or narcotics proceeds.

The Costa Organization's Street-Level Drug Sales

37.     Intercepted communications show DIAZ managing the Costa Organization's street-level sales and "runners"—i.e., individuals who deliver narcotics to customers.  For example, on or about October 15, 2021, at approximately 1:37 p.m., DIAZ had the following conversation with a customer whose surname begins with a "G" ("Customer 1"):

| | |
|---|---|
| Customer 1: | Can I get a ball? |
| DIAZ: | A'int not yet. |
| Customer 1: | Is it gonna be out by, like, 2:00? |
| DIAZ: | It should be. |
| Customer 1: | Alright.  Cool.  Send it over. |
| DIAZ: | Alright. |

At approximately 2:04 p.m., DIAZ then spoke with one of the Costa Organization's runners ("Co-Conspirator 1").  During that call, DIAZ said, "Big G, uh, he needs a biz."  Co-Conspirator 1 responded by saying he would "call him right now."  Based on my training and experience and the investigation to date, I understand the above two conversations to relate to Customer 1

23

calling DIAZ to purchase an eighth of an ounce of cocaine (an "eight ball" or a "ball"), and DIAZ then calling Co-Conspirator 1 to direct him to handle the transaction (with DIAZ referring to Customer 1 as "Big G"). Based on other communications that have been intercepted in this investigation, I understand DIAZ's use of the word "biz" to be a code word for an eighth of an ounce of cocaine.

19. Intercepted communications show that CAFARO distributes cocaine for the Costa Organization as a "runner," and DIAZ regularly instructs CAFARO on drug deliveries. For example, on October 19, 2021, a drug customer ("Customer 2") spoke with DIAZ on the phone and asked for "50 of Frankie." Based on my training and experience and the investigation to date, I understand "Frankie" to be a code word for cocaine. About one minute later, DIAZ called CAFARO and said, "Malibu most wanted, 50 of Frankie." Based on my training and experience and the investigation to date, I understand these conversations as follows: Customer 2 told DIAZ that Customer 2 wanted to buy $50 worth of cocaine; and DIAZ subsequently instructed CAFARO to deliver the drugs to Customer 2, referring to him as "Malibu most wanted."

20. The investigation has revealed that EDMUND EICHENAUER communicates with runners, including CAFARO, to manage the distribution of cocaine and that EDMUND EICHENAUER ensures that runners have enough cocaine on hand to sell to customers. For example, on November 28, 2021, at approximately 1:19 p.m., EDMUND EICHENAUER and CAFARO had the following exchange during an intercepted phone call:

24

EDMUND:        I just got over here.  What do you got left over there?

CAFARO:        Seventeen, one, twenty, eighteen.

EDMUND:        Seven.  Seventeen, one, twenty, and eighteen?

CAFARO:        Yeah.  Seventeen, number one . . . twenty, and eighteen.  We got one-five left.

EDMUND:        I gave you twenty . . .

CAFARO:        Huh?

EDMUND:        I gave you twenty sixes and twenty fours?

CAFARO:        No, no, no.  Uh . . .oh.  My bad, my bad.  I don't know why I said twenty.

EDMUND:        Oh, you mean ten and eight?

CAFARO:        Yeah, yeah, yeah.  Ten and eight.  I don't know why I said . . .

EDMUND:        Ten and eight.  Okay.  I—yo, you threw me off for a second.  I'm like, "wait, I gave you that much?"

CAFARO:        No, I don't even know why I said that.  I was just . . .

EDMUND:        Yeah, ten and eight.  Okay.

CAFARO:        Yeah.

EDMUND:        'Cause you used to get, you know . . .

CAFARO:        Yeah.

EDMUND:        . . . forty, forty, twenty, twenty.  So . . . a'right.  So, you're, you're good for two o'clock then.

CAFARO:        Gotchu, sir.

EDMUND:           A'right.  I'll see you in a few.

Based on my training and experience, as well as the information I have learned from this

investigation, I understand the above conversation as follows: EDMUND EICHENAUER and

CAFARO discussed the quantity of cocaine that was still in CAFARO's possession, based on

what EDMUND EICHENAUER had given to CAFARO earlier; and the two agreed to meet at

the Stash House Premises at approximately 2:00 p.m. so that EDMUND EICHENAUER could

give CAFARO more cocaine to be sold to customers.

21.     Video surveillance revealed that at approximately 2:02 p.m. on November

28, 2021, CAFARO drove from the Cafaro Premises to the Stash House Premises.  At

approximately 2:03 p.m., EDMUND EICHENAUER walked down the driveway from the rear of

the Stash House Premises towards CAFARO's car, carrying a large brown paper bag with the

word "PETCO" on it.  EDMUND EICHENAUER handed the bag to CAFARO through the

driver's window.  EDMUND EICHENAUER then walked back up the driveway to the Stash

House Premises and CAFARO drove away.  At approximately 2:12 p.m., CAFARO returned to

the Cafaro Premises, exited his car with the brown PETCO bag, and walked inside his house.

22.     The investigation has further revealed that CAFARO assists COSTA in

making large-scale sales.  For example, on December 9, 2021, at approximately 8:27 p.m.,

CAFARO and COSTA had the following exchange during an intercepted phone call:

COSTA:           That's a no go.

CAFARO:          Oh, no?

COSTA:          Nah, he tried it.  You know he's, he's a professional at that.

CAFARO:         Damn.

COSTA:          But I told him, just bring it back or . . . I'll just grab it.  So I'm
                gonna find out right now.  So . . . Just tell your boy he can come
                grab it anytime he wants.

CAFARO:         [Chuckles]

COSTA:          I tried!  You see I'm trying.

CAFARO:         Listen, I know.

COSTA:          I was [U/I] . . .

CAFARO:         [U/I] when I put the, when I put the, the um . . . the, the razor.

COSTA:          Yeah.

CAFARO:         It went—it went right in.

COSTA:          Yeah.  It's doo-doo.  Nah, they send you a waste of my time, but I
                tried.

CAFARO:         You tried.

COSTA:          I'm gonna throw you a few dollars.  Everybody make everybody
                happy.  But not good.  What you gonna do?  A'ight.  So, when you
                call, before you call him tomorrow, tell him the other . . .  Uh . . .
                What's his name?  That other kid.  Be like, "Yo, just come grab it."
                [U/I]

CAFARO:         Yeah, I'll call—I'll call him tomorrow morning.

COSTA:          You could tell him, "It's no good for the water."

CAFARO:         Yeah.  There's no rush.

COSTA:          I tried, I tried.  But say it like that, "No good for the water."

CAFARO:         A'ight.

38.     Based on my training and experience, and the investigation to date, including surveillance on the night of December 9, 2021, I understand the above conversation as follows: COSTA informed CAFARO that a potential customer was unwilling to purchase the cocaine he had recently picked up from CAFARO; COSTA admitted to CAFARO that the quality of the cocaine was poor; CAFARO stated that when he put a razor into the cocaine, the razor slipped right in, demonstrating the poor quality of the cocaine; and COSTA then asked CAFARO to attempt to return the cocaine to the individual from whom they procured it, and instructed CAFARO to tell that individual that the cocaine was "No good for the water," which I understand to be a reference to the unsuitability of the cocaine for the purpose of producing crack cocaine, which requires water.

<u>The Costa Organization's Laundering of Drug Proceeds</u>

39.     On December 23, 2021, law enforcement intercepted two phone calls during which some of the SUBJECT PERSONS discussed money laundering.  At approximately 4:47 p.m., COSTA had the following conversation with DIAZ:

| | |
|---|---|
| COSTA: | Uh…you…This kid, uh, said if you wanted to cla—if you wanted cla—uh, get money for a check. One handshake. Let me know. |
| DIAZ: | Mm-hmm. |
| COSTA: | Fifty. A hundred. Whatever you wanna do. |
| DIAZ: | Mm…What do you think? Nigga, you know more about that than me. |

| | |
|---|---|
| COSTA: | What do you have laying around? Nigga that shit is money in your bank is better than the money in anywhere, anywhere else, but, that's… |
| DIAZ: | Uh, right now, I got thirty. |
| COSTA: | Thirty? Then, I gotta give you the twenty-five. Yeah, you should do, you should do the fifty. |
| DIAZ: | A'right. So, yeah or what? What time? |
| COSTA: | And I'mma give, I'mma give you twenty-five whenever this guy calls, you got all that. |
| DIAZ: | A'ight. |
| COSTA: | Yeah, you don't have to even give him the money all up front. You give him the thirty or do the fifty. You gotta send me your social. Uh… damn you have to use my address, I mean— |
| DIAZ: | Or I could put, I could put the other one, right? |
| COSTA: | What? What other? |
| DIAZ: | The, the thirty-two, right? That's—that be my place for residency, right? |
| COSTA: | Oh, yeah. You could use that one [U/I]. Yes. |
| DIAZ: | Yeah. That's what I'm saying. I'm saying… |
| COSTA: | Send me… |
| DIAZ: | So… |
| COSTA: | Yeah, it is…All I say [U/I] … |
| DIAZ: | A'ight. I'll tell… |
| COSTA: | …so, send me to George's burnout phone. |
| DIAZ: | A'right. He don't got one. |

| | |
|---|---|
| COSTA: | Shit. A'ight. |
| DIAZ: | A'ight. |

Thirty minutes later, at approximately 4:50 p.m., COSTA called GEORGE EICHENAUER and had the following conversation:

| | |
|---|---|
| COSTA: | You wanna clean up a hundred. You got it. |
| GEORGE: | Yeah? |
| COSTA: | Yeah. |
| GEORGE: | Hell yeah. He's gonna charge me something? |
| COSTA: | No, nigga. You just gonna pay taxes on it. |
| GEORGE: | So, how does that work? |
| COSTA: | Uh, tomorrow, he'll cut you a check. You gotta— |
| GEORGE: | Yeah. |
| COSTA: | He needs your social, your address. Tomorrow you go there, give him the hundred and he'll give you a check, deposit it in your account. Then, when you go to your accountant, your accountant is gonna pay taxes on it. I don't know the bracket take but— |
| GEORGE: | Yeah. |
| COSTA: | Whatever it is. [U/I] — |
| GEORGE: | I would do—I rather do it in—like in the after, after this week. |
| COSTA: | No, it has to— |
| GEORGE: | So, so… Oh, he's trying to do it now? |
| COSTA: | Yeah, he gotta do it before the new year. |
| GEORGE: | Oh, that's why. Alright. Yeah, whatevers bro. |

| | |
|---|---|
| COSTA: | He's trying to unload it. He would give it to me but nigga, I'm up to six hundred with him. I actually owe him a Bean [PH]. Well, I owe him one-o-eight to be exact. [CHUCKLES] That's how… I'm a little backed up. He was like, "Yo, I'll give it to you." I said, "Nigga, I'm back up." But he, he's gave me the most he could give me. |
| GEORGE: | Hell yeah, nigga. I'm ru… |
| COSTA: | He's like, "I got this much." I even told, I even told Rick right now. He's like, "Yo, I take fifty from Rick. Tell him hit me when he could hit me with it." |
| GEORGE: | Yeah. |
| COSTA: | I said, "I think G would do it." I said, "Let me ask him." I said, "If he wants to, send me the social right now. I'll put him in, whatever, whatever." |
| GEORGE: | Yeah, I'll do it, bro. |
| COSTA: | A'ight. So, [U/I] — |
| GEORGE: | How much taxes you pay out of that? |
| COSTA: | It depends what you already showed.  Like, I told you, after you pass like two-fifty [U/I] |
| GEORGE: | For this year, I'm showing at least, from Paul, like, seventy — seventy-two. |
| COSTA: | Yeah. So, you still under the two fifty bracket. You probably talking 'bout thirty something percent.  I don't know. |
| GEORGE: | Yeah. |
| COSTA: | I don't, I don't know. But I can't, I can't liberate on [U/I] — |
| GEORGE: | How's it gonna go? Like, it's like I made it out off of a real estate thing or something? |
| COSTA: | Yeah. You brung him deals. Like, um… you brung him deals, to uh bank loans. Like, you know. |

31

| GEORGE: | Hell yeah, nigga. I'll do that shit. |
| COSTA: | So, be ready tomorrow [U/I] — |
| GEORGE: | Be where I wanna be. |
| COSTA: | Se—send me the info, send me your info. Your first name, last name and your social to uh… to my other phone. So, I can send it to him. And then, tomorrow— |
| GEORGE: | Alright. |
| COSTA: | And then tomorrow around lunch we'll go over there and grab the check. |
| GEORGE: | I gotta grab the bread though. I gotta grab the bread. |
| COSTA: | Grab the bread. |
| GEORGE: | I gotta go to Queens. Yeah. |
| COSTA: | A'ight. |
| GEORGE: | A'ight. Yeah, I'mma send you that right now. |
| COSTA: | A'ight. |

Based on my training and experience, and the information I have learned in the investigation to date, I understand the above conversations as follows: COSTA solicited DIAZ and GEORGE EICHENAUER to launder and conceal their narcotics proceeds through a third party, as COSTA had done ("You wanna clean up a hundred?"); in the conversation with GEORGE EICHENAUER, COSTA explained that the process involved GEORGE EICHENAUER bringing the third party cash in exchange for a check, which he would receive the following day ("tomorrow around lunch we'll go over there and grab the check"), and that the only catch was that he would have to pay

taxes on that sum; COSTA further explained that the check would ostensibly be for having brought the third party bank loans ("How's it gonna go? . . . . like, I made it out of a real estate thing, or something?" "you brung him deals, to uh bank loans"); COSTA informed GEORGE EICHENAUER that COSTA had already cleaned $600,000 with the third party during an unspecific time frame ("I'm up to six hundred with him"), which is why COSTA could not clean any further money with third party for the year.  Bank records indicate that within the week following this call, GEORGE EICHENAUER deposited three checks into one of his bank accounts, totaling $100,000.  Based on the above-described conversations, I believe that these deposits reflect GEORGE EICHENAUER cleaning approximately $100,000 in narcotics proceeds through the third party, as discussed and agreed with COSTA.

Summary of Probable Cause to Search Jose Costa, Ricardo Diaz, and the Costa Premises

40.     The Costa Premises is COSTA's home.  As noted above, both COSTA and DIAZ have been observed meeting with co-conspirators at the Costa Premises on multiple occasions to receive narcotics and narcotics proceeds.

41.     Based on the foregoing, as well as my training and experience, there is probable cause to search the Costa Premises and the persons of COSTA and DIAZ.  I know that persons involved in the Subject Offenses, such as COSTA and DIAZ, often retain evidence of their crimes in their homes and on their persons, including narcotics, narcotics proceeds, narcotics ledgers, records and communications relating to narcotics suppliers and customers, narcotics paraphernalia, scales, receipts, and financial records.  I also know that persons involved in the

Subject Offenses, such as COSTA and DIAZ, often use their cellular phones, both to store evidence of their crimes and as instrumentalities of their crimes, including to communicate with co-conspirators and customers, store records of narcotics transactions, and perform financial transactions relating to money laundering.  Indeed, as described above, law enforcement has intercepted numerous narcotics-related wire and electronic communications occurring over cell phones used by COSTA and DIAZ.  Accordingly, there is probable cause to believe that evidence, fruits, contraband and instrumentalities of the Subject Offenses will be found in the Costa Premises and on the persons of COSTA and DIAZ.

<u>Summary of Probable Cause to Search the Stash House Premises</u>

42.    The Stash House Premises is used by the SUBJECT PERSONS to store, package, prepare and distribute narcotics.  Per the surveillance described above, law enforcement has observed EDMUND EICHENAUER, CAFARO, and other co-conspirators enter and exit the Stash House Premises through the side door entrance, including on dates and times corresponding with intercepted communications during which co-conspirators discuss meetings to transfer or handle narcotics.

43.    Based on the foregoing, as well as my training and experience, there is probable cause to search the Stash House Premises.  I know that persons involved in the Subject Offenses, such as the co-conspirators described above, often retain evidence of their crimes in drug stash houses, including narcotics, narcotics proceeds, narcotics ledgers, records and communications

relating to narcotics suppliers and customers, narcotics paraphernalia, scales, receipts, and financial records.

Summary of Probable Cause to Search Arcangelo Cafaro and the Cafaro Premises

44.     The Cafaro Premises is CAFARO's home.  As described above, CAFARO is a runner for the drug trafficking organization and has been observed retrieving narcotics from the Stash House Premises and bringing said narcotics directly back to the Cafaro Premises.

45.     Based on the foregoing, as well as my training and experience, there is probable cause to search the Cafaro Premises and the person of CAFARO.  I know that persons involved in the Subject Offenses, such as CAFARO, often retain evidence of their crimes in their homes and on their persons, including narcotics, narcotics proceeds, narcotics ledgers, records and communications relating to narcotics suppliers and customers, narcotics paraphernalia, scales, receipts, and financial records.  I also know that persons involved in the Subject Offenses, such as CAFARO, often use their cellular phones, both to store evidence of their crimes and as instrumentalities of their crimes, including to communicate with co-conspirators and customers, store records of narcotics transactions, and perform financial transactions relating to money laundering.  Indeed, as described above, while intercepting narcotics-related wire communications occurring over cell phones used by COSTA and DIAZ, agents have intercepted communications with CAFARO in which he discusses narcotics trafficking.  Accordingly, there is probable cause to believe that evidence, fruits, contraband and instrumentalities of the Subject Offenses will be found in the Cafaro Premises and on the person of ARCANGELO CAFARO.

<u>Summary of Probable Cause to Search Edmund Eichenauer,
George Eichenauer, and the Eichenauer Premises</u>

46.     The Eichenauer Premises is the home of EDMUND EICHENAUER and

GEORGE EICHENAUER.  As noted above, agents have observed EDMUND EICHENAUER

leave the Eichenauer Premises, meet with co-conspirators, go to the Stash House Premises, and

return to the Eichenauer Premises on several occasions while carrying objects that are likely

narcotics or narcotics proceeds.  In addition, members of the Costa Organization have discussed

the supply of narcotics in GEORGE EICHENAUER's possession, and GEORGE

EICHENAUER has been heard on intercepted communications discussing the laundering of

illicit proceeds.

47.     Based on the foregoing, as well as my training and experience, there is probable

cause to search the Eichenauer Premises and the persons of EDMUND EICHENAUER and

GEORGE EICHENAUER.  I know that persons involved in the Subject Offenses, such as

EDMUND EICHENAUER and GEORGE EICHENAUER, often retain evidence of their crimes

in their homes and on their persons, including narcotics, narcotics proceeds, narcotics ledgers,

records and communications relating to narcotics suppliers and customers, narcotics

paraphernalia, scales, receipts, and financial records.  I also know that persons involved in the

Subject Offenses, such as EDMUND EICHENAUER and GEORGE EICHENAUER, often use

their cellular phones, both to store evidence of their crimes and as instrumentalities of their

crimes, including to communicate with co-conspirators and customers, store records of narcotics

transactions, and perform financial transactions relating to money laundering.  Indeed, as

described above, law enforcement has intercepted several wire communications during which EDMUND EICHENAUER and GEORGE EICHENAUER discuss narcotics trafficking and money laundering.  Accordingly, there is probable cause to believe that evidence, fruits, contraband and instrumentalities of the Subject Offenses will be found in the Eichenauer Premises and on the persons of EDMUND EICHENAUER and GEORGE EICHENAUER.

* * * * *

48.    Based on the foregoing, and my training and experience, there is probable cause to believe that the SUBJECT PREMISES will contain and the SUBJECT PERSONS will have on their persons evidence, fruits, contraband and instrumentalities of the Subject Offenses, including narcotics, narcotics proceeds, narcotics paraphernalia, narcotics ledgers, scales, receipts, financial records, address books, and records reflecting communications with co-conspirators and narcotics customers.

49.    Based on my training, experience, and information gathered in this investigation, I know that individuals who commit the Subject Offenses routinely secrete and store narcotics and narcotics proceeds of the sort described in the preceding paragraphs in secure locations like cabinets, storage lockers, safety deposit boxes, suitcases, briefcases, safes, key-lock strong boxes and other types of locked or closed containers in an effort to prevent the discovery or theft of said items.  I therefore seek authorization to open any closed or locked items and containers or to seize any such closed or locked items and containers so that they may be opened if tools or other implements are required.

50. Additionally, based on the foregoing and my training and experience, I know that individuals involved in narcotics trafficking schemes like the ones described herein commonly use their cellular phones both to store evidence and as instrumentalities of the schemes. As described in detail above, the SUBJECT PERSONS regularly use cell phones to communicate with one another and with customers to facilitate their drug trafficking activities. I know from my training and experience in other cases that drug traffickers also often use cellular devices to take and share photographs of narcotics, narcotics proceeds, and other items relating to their trafficking activities. Often this media will be retained on a cellular phone unless and until the user deletes it, and even then the media can at times be recovered. Cellular phones can also be used to access banking records tied to money laundering transactions, to determine when accounts controlled by co-conspirators are funded and by how much, and to make transfers to other bank accounts.

51. Through subscriber records, surveillance contemporaneous with intercepted communications, and user self-identification during intercepted communications, law enforcement has determined that the following SUBJECT PERSONS use cellular devices assigned the following phone numbers:

- JOSE COSTA: (718) 207-8238

- RICARDO DIAZ: (347) 753-5648

- EDMUND EICHENAUER: (718) 568-6829

- GEORGE EICHENAUER: (347) 545-2109

- ARCANGELO CAFARO: (646) 740-3480

- JAY SANCHEZ: (347) 267-6569

52.     The applied-for-warrants would allow the seizure of: (1) any cellular phone found on the SUBJECT PERSONS or within their immediate reach; and (2) any cellular phone that rings when law enforcement calls any of the phone numbers listed in paragraph 51 above, even if not immediately on the SUBJECT PERSONS or within their reach.

## TECHNICAL TERMS

53.     Based on my training and experience, I use the following technical terms to convey the following meanings:

(a)     Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones

may also include global positioning system ("GPS") technology for determining the location of the device.

(b)      Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

(c)      Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

(d)      GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS

40

navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

(e)     PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

(f)      Tablet:  A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen.  Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise.  Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions.  Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

(g)      IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

(h)      Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

54.     Based on my training, experience, surveillance and research, I know that the SUBJECT PERSONS use or are likely to use electronic devices that have capabilities that allow them to serve as wireless telephones, digital cameras, portable media players, GPS navigation devices, and PDAs.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

55.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

56.     *Forensic evidence.*  As further described in Attachments B-1 through B-10, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrants, but also forensic evidence that establishes how the devices were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence might be on the devices because:

(a)     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

43

(b)     Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

(c)     A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

(d)     The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

(e)     Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

57.     *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrants I am applying for would permit the examination of the devices consistent with the warrants. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose

many parts of the device to human inspection in order to determine whether it is evidence described by the warrants.

## BIOMETRIC UNLOCKING

58.     In my training and experience, it is likely that if the SUBJECT PERSONS have any cellular phones, then one or more of those cellular phones uses biometric unlocking features, such as facial recognition unlocking.

59.     The warrants I am applying for would permit law enforcement to unlock the cellular phones using the devices' biometric features.  I seek this authority based on the following:

(a)     I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many cellular phones offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password.  These biometric features include fingerprint scanners, facial recognition features and iris recognition features.  Some devices offer a combination of these biometric features and the user of such devices can select which features they would like to utilize.

(b)     If a cellular phone is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints.  For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device.  Once a fingerprint is registered, a user can unlock the device by pressing the

relevant finger to the device's Touch ID sensor, which is often found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device.  The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

(c)     If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face.  In order to activate this unlocking mechanism, the user holds the device in front of his or her face.  The device's front-facing camera then analyzes and records data based on the user's facial characteristics.  The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face.

(d)     If a device is equipped with an iris recognition feature, a user may enable the ability to unlock the device with his or her irises.  For example, on certain Microsoft devices, this feature is called "Windows Hello."  During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face.  The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises.  The device can then be unlocked if the infrared-sensitive camera detects the registered irises.  Iris recognition features on other manufacturers' devices have different names but operate similarly to Windows Hello.

(e)     In my training and experience, users of cellular phones often enable the aforementioned biometric features because they are considered to be a more convenient way to

46

unlock a device than by entering a numeric or alphanumeric passcode or password.  Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.  This is particularly true when the users are engaged in criminal activities and thus have a heightened concern about securing the contents of their devices.

(f)     I also know from my training and experience, as well as from information found in publicly available materials, including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled.  This can occur when a device has been restarted, inactive or has not been unlocked for a certain period of time.  For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked, or (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days.  Biometric features from other electronic device brands carry similar restrictions.  Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

(g)     The passcode or password that would unlock a given device recovered during execution of the requested warrants likely will not be known to law enforcement.  Thus, in attempting to unlock any such devices for the purpose of executing the searches authorized by the requested warrants, it will likely be necessary to press the finger(s) of the user on the fingerprint reader of any device capable of biometric unlocking.  The government may not

otherwise be able to access the data contained on the electronic devices for the purpose of executing the search authorized by these warrants.

(h)     In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device.

72.     Due to the foregoing, if any of the SUBJECT PERSONS' cellular phones may be unlocked using one of the aforementioned biometric features, then the warrants I am applying for would permit law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of the SUBJECT PERSONS against the fingerprint scanner of the devices; (2) hold the SUBJECT PERSONS in place while holding the devices in front of their face to activate the facial recognition feature; and/or (3) hold the SUBJECT PERSONS in place while holding the devices in front of their faces to activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by these warrants.

73.     Law enforcement officers will select which fingers to press to the SUBJECT PERSONS' cellular phones.  The warrants do not authorize law enforcement to compel that the SUBJECT PERSONS state or otherwise provide the password or any other means that may be used to unlock or access any cellular phones.  Moreover, the warrants do not authorize law enforcement to compel the SUBJECT PERSONS to identify the specific biometric

characteristics (including unique fingerprint(s) or other physical features) that may be used to

unlock or access any cellular phones.[5]

## CONCLUSION

74.     I submit that this affidavit supports probable cause for warrants to:

(a) search the SUBJECT PREMISES, and any closed or locked containers therein, described in

Attachments A-1 to A-4, and to seize the items described in Attachments B-1 to B-4; and (b)

---

[5]  In the course of my training and experience, I have become familiar with federal court decisions standing for the proposition that government agents may compel individuals to provide biometric data in order to effectuate a search of devices lawfully seized pursuant to a warrant. For example, in In re Search Warrant Application, 279 F. Supp. 3d 800, 801 (N.D. Ill. 2017), the District Court for the Northern District of Illinois reversed a magistrate judge's decision that the Fifth Amendment's privilege against self-incrimination barred a portion of a search warrant that would have required "residents of a home to apply their fingers and thumbs (as chosen by government agents) to the fingerprint sensor on any Apple-made devices found at the home during the search."  The district court noted that the Fifth Amendment "only prevents the government from compelling a person from being a 'witness' against himself" and that, since "[w]itnesses provide testimony, [ ] that is the forbidden compulsion; the government cannot force someone to provide a communication that is 'testimonial' in character." Id. at 803 (emphasis in original).  On the other hand, "the Supreme Court has distinguished between compelling a communication versus compelling a person to do something that, in turn, displays a physical characteristic that might be incriminating." Id. (citing United States v. Hubbell, 530 U.S. 27, 34 (2000) and collecting cases).  Applied in the context of biometric data, the court held that, especially where government agents select the fingers to be pressed on the Touch ID sensor, thereby eliminating the "need to engage the thought process of any of the residents at all in effectuating the seizure," "[t]he application of the fingerprint to the sensor is simply the seizure of a physical characteristic, and the fingerprint by itself does not communicate anything." Id. at 803–04 (emphasis in original).  More recently, similar reasoning supported a search warrant that would compel biometric data not only from an individual's fingerprints, but from his face and irises as well. See In re Search of [Redacted Text], No. 18-SW-0122 (GMH), 2018 U.S. Dist. LEXIS 109572 (D.D.C. June 26, 2018).

search the SUBJECT PERSONS, described in Attachment A-5 to A-10, and to seize the cellular

phones and items described in Attachments B-5 to B-10.

## **REQUEST FOR SEALING**

75.     I respectfully request that this Court issue an order sealing, until further order of

the Court, all papers submitted in support of this application, including the application and search

warrants.  I believe that sealing this document is necessary because this investigation is neither

public nor known to the targets of the investigation, who remain at large.  Premature disclosure

of the contents of this affidavit and related documents may have a significant and negative

impact on the continuing investigation and may severely jeopardize its effectiveness.

SCOTT M
SALAMON

Digitally signed by SCOTT M
SALAMON
Date: 2022.01.18 21:15:13 -05'00'

SCOTT SALAMON
Special Agent
U.S. Department of Homeland Security, Homeland
Security Investigations


Sworn to before me by telephone this
____ 19 day of January, 2022

*Lois Bloom*

THE HONORABLE LOIS BLOOM
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

50

## **ATTACHMENT A-1**

*Property to Be Searched*

The property to be searched is known and particularly described as all areas of the home located at 14 Argyle Road, Westbury, New York 11590 and any closed or locked containers therein (the "COSTA PREMISES"). The COSTA PREMISES is a two-story, single-family home with a green roof, a front door framed by four white pillars, and an attached two-car garage. Pictures of the COSTA PREMISES, taken from the front of the residence and from above the residence, respectively, can be seen as follows:





## ATTACHMENT B-1

*Property to Be Seized*

Any evidence, contraband, fruits and instrumentalities relating to violations of Title 21, United States Code, Sections 841 and 846 (narcotics trafficking and conspiracy to traffic narcotics) and Title 18, United States Code, Section 1956 (money laundering) (collectively, the "Subject Offenses") involving ARCANGELO CAFARO, JOSE COSTA, RICARDO DIAZ, EDMUND EICHENAUER, GEORGE EICHENAUER, JAY SANCHEZ, or their co-conspirators and associates, between December 1, 2020 to the present, and relating to the occupancy and/or ownership of the COSTA PREMISES including the following:

a. Narcotics or other controlled substances;

b. Drug paraphernalia, including, but not limited to, scales, baggies, and instruments that may be used to press narcotics into pills or tightly compacted quantities;

c. Proceeds of narcotics trafficking, including U.S. currency and financial instruments;

d. Lists of narcotics customers and related identifying information;

e. Types, amounts, and prices of drugs trafficked, as well as dates, places, and amounts of specific transactions;

f. Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

g. All bank records, checks, credit card bills, account information, and other financial records, to the extent such information relates to the Subject Offenses;

h. Identification evidence and/or indicia, such as mail, photographs, bills and identification documents that tend to identify the persons in residence, occupancy, control and/or ownership of the COSTA PREMISES;

i.  Records, keys and passcodes concerning cabinets, storage lockers, safety deposit boxes, suitcases, briefcases, safes, key-lock strong boxes and other types of locked or closed containers related to the Subject Offenses; and

j.  Any cellular phone found within a bedroom identified as one in which JOSE COSTA had been sleeping, any cellular phone found within a room in which agents find any evidence/contraband/fruits/instrumentalities within the scope of subsections (a) through (g) above, and any cellular phone that rings when agents call the number (718) 207-8238.  Cellular phones seized in the aforementioned ways may be searched for the purpose of identifying and seizing the following:

- Records and information relating to subsections (a) through (i) above;

- Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received by the cellular phones and which relate to the Subject Offenses;

- Evidence of who used, owned, or controlled the cellular phones at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

- Photographs, videos, and other stored media that relates to the Subject Offenses;

- Evidence that the cellular phones were used as instrumentalities of the Subject Offenses;

- Evidence indicating how and when the cellular phones were accessed or used to determine the chronological context of cellular-phone access, use, and events relating to the Subject Offenses and the cellular phone user;

- Evidence indicating the cellular phones user(s)'s state of mind as it relates to the Subject Offenses;

- Passwords, encryption keys and other access devices that may be necessary to access the cellular phones;

2

- Records of or information about the cellular phones' internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses, to the extent such information relates to the Subject Offenses; and

- Contextual information necessary to understand the evidence described in this attachment.

For the cellular phone(s) described in subsection (j), this warrant authorizes law enforcement personnel to: press or swipe the fingers (including thumbs) of JOSE COSTA against the fingerprint scanner of a cellular phone with a biometric unlocking feature; hold JOSE COSTA in place while holding a cellular phone with a biometric unlocking feature in front of his face to activate the facial recognition feature; and/or hold JOSE COSTA in place while holding a cellular phone with a biometric unlocking feature in front of his face to activate the iris recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.  Law enforcement officers will select which fingers (including thumbs) to press to the cellular phones.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in

3

addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigative agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## **ATTACHMENT A-2**

*Property to Be Searched*

The property to be searched is known and particularly described as the lowest-level residential unit that is directly accessible through a side door entrance that is located approximately halfway down the driveway of the two-story, two-family home located at 102-15 Dunton Court, Howard Beach, New York 11414 and any closed or locked containers within such unit (the "STASH HOUSE PREMISES").  The home has two white front doors that are accessible by a concrete stairway of about six to seven steps, and the numbers "10215" can be seen on the building, directly above the two front doors.  For the avoidance of doubt, the property to be searched does not include any residential units on the top floor of the home. Photographs of the STASH HOUSE PREMISES can be seen as follows:

 

**ATTACHMENT B-2**

*Property to Be Seized*

Any evidence, contraband, fruits and instrumentalities relating to violations of

Title 21, United States Code, Sections 841 and 846 (narcotics trafficking and conspiracy to

traffic narcotics) and Title 18, United States Code, Section 1956 (money laundering)

(collectively, the "Subject Offenses") involving ARCANGELO CAFARO, JOSE COSTA,

RICARDO DIAZ, EDMUND EICHENAUER, GEORGE EICHENAUER, JAY SANCHEZ, or

their co-conspirators and associates, between December 1, 2020 to the present, and relating to

the occupancy and/or ownership of the STASH HOUSE PREMISES including the following:

a. Narcotics or other controlled substances;

b. Drug paraphernalia, including, but not limited to, scales, baggies, and instruments that may be used to press narcotics into pills or tightly compacted quantities;

c. Proceeds of narcotics trafficking, including U.S. currency and financial instruments;

d. Lists of narcotics customers and related identifying information;

e. Types, amounts, and prices of drugs trafficked, as well as dates, places, and amounts of specific transactions;

f. Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

g. All bank records, checks, credit card bills, account information, and other financial records, to the extent such information relates to the Subject Offenses;

h. Identification evidence and/or indicia, such as mail, photographs, bills and identification documents that tend to identify the persons in residence, occupancy, control and/or ownership of the STASH HOUSE PREMISES;

i.  Records, keys and passcodes concerning cabinets, storage lockers, safety deposit boxes, suitcases, briefcases, safes, key-lock strong boxes and other types of locked or closed containers related to the Subject Offenses; and

j.  Any cellular phones, which may be searched for the purpose of identifying and seizing the following:

- Records and information relating to subsections (a) through (i) above;

- Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received by the cellular phones and which relate to the Subject Offenses;

- Evidence of who used, owned, or controlled the cellular phones at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

- Photographs, videos, and other stored media that relates to the Subject Offenses;

- Evidence that the cellular phones were used as instrumentalities of the Subject Offenses;

- Evidence indicating how and when the cellular phones were accessed or used to determine the chronological context of cellular-phone access, use, and events relating to the Subject Offenses and the cellular phone user;

- Evidence indicating the cellular phones user(s)'s state of mind as it relates to the Subject Offenses;

- Passwords, encryption keys and other access devices that may be necessary to access the cellular phones;

- Records of or information about the cellular phones' internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses, to the extent such information relates to the Subject Offenses; and

- Contextual information necessary to understand the evidence described in this attachment.

For the cellular phone(s) described in subsection (j), this warrant authorizes law enforcement personnel to: press or swipe the fingers (including thumbs) of any individual found within the STASH HOUSE PREMISES at the time this warrant is executed and who is within arm's reach of such cellular phone(s), against the fingerprint scanner of a cellular phone with a biometric unlocking feature; hold such individual in place while holding a cellular phone with a biometric unlocking feature in front of his/her face to activate the facial recognition feature; and/or hold such individual in place while holding a cellular phone with a biometric unlocking feature in front of his/her face to activate the iris recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant. Law enforcement officers will select which fingers (including thumbs) to press to the cellular phones.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support

3

staff, and technical experts.  Pursuant to this warrant, the investigative agency may deliver a

complete copy of the seized or copied electronic data to the custody and control of attorneys for

the government and their support staff for their independent review.

## ATTACHMENT A-3

*Property to Be Searched*

The property to be searched is known and particularly described as all areas of the home located at 94-49 109th Avenue, Ozone Park, New York 11417 and any closed or locked containers therein (the "CAFARO PREMISES"). The CAFARO PREMISES is a two-story, single-family brick home with a dark brown front door, a storm door, the numbers "9449" mounted on the brick façade to the left of the front door, a concrete stairway of about four to five steps leading to the front door, and a garage is attached to the back of the home. Pictures of the CAFARO PREMISES can be seen as follows:





**ATTACHMENT B-3**

*Property to Be Seized*

Any evidence, contraband, fruits and instrumentalities relating to violations of

Title 21, United States Code, Sections 841 and 846 (narcotics trafficking and conspiracy to

traffic narcotics) and Title 18, United States Code, Section 1956 (money laundering)

(collectively, the "Subject Offenses") involving ARCANGELO CAFARO, JOSE COSTA,

RICARDO DIAZ, EDMUND EICHENAUER, GEORGE EICHENAUER, JAY SANCHEZ, or

their co-conspirators and associates between December 1, 2020 to the present, and relating to the

occupancy and/or ownership of the CAFARO PREMISES including the following:

a. Narcotics or other controlled substances;

b. Drug paraphernalia, including, but not limited to, scales, baggies, and instruments that may be used to press narcotics into pills or tightly compacted quantities;

c. Proceeds of narcotics trafficking, including U.S. currency and financial instruments;

d. Lists of narcotics customers and related identifying information;

e. Types, amounts, and prices of drugs trafficked, as well as dates, places, and amounts of specific transactions;

f. Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

g. All bank records, checks, credit card bills, account information, and other financial records, to the extent such information relates to the Subject Offenses;

h. Identification evidence and/or indicia, such as mail, photographs, bills and identification documents that tend to identify the persons in residence, occupancy, control and/or ownership of the CAFARO PREMISES;

2

i.  Records, keys and passcodes concerning cabinets, storage lockers, safety deposit boxes, suitcases, briefcases, safes, key-lock strong boxes and other types of locked or closed containers related to the Subject Offenses; and

j.  Any cellular phone found within a bedroom identified as one in which ARCANGELO CAFARO had been sleeping, any cellular phone found within a room in which agents find any evidence/contraband/fruits/instrumentalities within the scope of subsections (a) through (g) above, and any cellular phone that rings when agents call the number (646) 740-3480.  Cellular phones seized in the aforementioned ways may be searched for the purpose of identifying and seizing the following:

- Records and information relating to subsections (a) through (i) above;

- Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received by the cellular phones and which relate to the Subject Offenses;

- Evidence of who used, owned, or controlled the cellular phones at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

- Photographs, videos, and other stored media that relates to the Subject Offenses;

- Evidence that the cellular phones were used as instrumentalities of the Subject Offenses;

- Evidence indicating how and when the cellular phones were accessed or used to determine the chronological context of cellular-phone access, use, and events relating to the Subject Offenses and the cellular phone user;

- Evidence indicating the cellular phones user(s)'s state of mind as it relates to the Subject Offenses;

- Passwords, encryption keys and other access devices that may be necessary to access the cellular phones;

3

- Records of or information about the cellular phones' internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses, to the extent such information relates to the Subject Offenses; and

- Contextual information necessary to understand the evidence described in this attachment.

For the cellular phone(s) described in subsection (j), this warrant authorizes law enforcement personnel to: press or swipe the fingers (including thumbs) of ARCANGELO CAFARO against the fingerprint scanner of a cellular phone with a biometric unlocking feature; hold ARCANGELO CAFARO in place while holding a cellular phone with a biometric unlocking feature in front of his face to activate the facial recognition feature; and/or hold ARCANGELO CAFARO in place while holding a cellular phone with a biometric unlocking feature in front of his face to activate the iris recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.  Law enforcement officers will select which fingers (including thumbs) to press to the cellular phones.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in

4

addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigative agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

**ATTACHMENT A-4**

*Property to Be Searched*

The property to be searched is known and particularly described as all areas of the home located at 252 Jericho Turnpike, Westbury, New York 11590, as well as any garages adjacent to the home (the "EICHENAUER PREMISES").  The EICHENAUER PREMISES is a two-story, single-family brick home, with a façade that is partially obstructed by several trees and bushes in the front lawn.  Facing the residence from Jericho Turnpike, there is a partial gravel driveway to the right of the home, and there is a garage at the end of the driveway. Photographs of the EICHENAUER PREMISES can be seen as follows:





**ATTACHMENT B-4**

*Property to Be Seized*

Any evidence, contraband, fruits and instrumentalities relating to violations of Title 21, United States Code, Sections 841 and 846 (narcotics trafficking and conspiracy to traffic narcotics) and Title 18, United States Code, Section 1956 (money laundering) (collectively, the "Subject Offenses") involving ARCANGELO CAFARO, JOSE COSTA, RICARDO DIAZ, EDMUND EICHENAUER, GEORGE EICHENAUER, JAY SANCHEZ, or their co-conspirators and associates between December 1, 2020 to the present, and relating to the occupancy and/or ownership of the EICHENAUER PREMISES including the following:

a.  Narcotics or other controlled substances;

b.  Drug paraphernalia, including, but not limited to, scales, baggies, and instruments that may be used to press narcotics into pills or tightly compacted quantities;

c.  Proceeds of narcotics trafficking, including U.S. currency and financial instruments;

d.  Lists of narcotics customers and related identifying information;

e.  Types, amounts, and prices of drugs trafficked, as well as dates, places, and amounts of specific transactions;

f.  Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

g.  All bank records, checks, credit card bills, account information, and other financial records, to the extent such information relates to the Subject Offenses;

h.  Identification evidence and/or indicia, such as mail, photographs, bills and identification documents that tend to identify the persons in residence, occupancy, control and/or ownership of the EICHENAUER PREMISES;

i.  Records, keys and passcodes concerning cabinets, storage lockers, safety deposit boxes, suitcases, briefcases, safes, key-lock strong boxes and other types of locked or closed containers related to the Subject Offenses; and

j.  Any cellular phone found within a bedroom identified as one in which EDMUND EICHENAUER or GEORGE EICHENAUER had been sleeping, any cellular phone found within a room in which agents find any evidence/contraband/fruits/instrumentalities within the scope of subsections (a) through (g) above, and any cellular phone that rings when agents call the number (718) 568-6829 or the number (347) 545-2109.  Cellular phones seized in the aforementioned ways may be searched for the purpose of identifying and seizing the following:

- Records and information relating to subsections (a) through (i) above;

- Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received by the cellular phones and which relate to the Subject Offenses;

- Evidence of who used, owned, or controlled the cellular phones at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

- Photographs, videos, and other stored media that relates to the Subject Offenses;

- Evidence that the cellular phones were used as instrumentalities of the Subject Offenses;

- Evidence indicating how and when the cellular phones were accessed or used to determine the chronological context of cellular-phone access, use, and events relating to the Subject Offenses and the cellular phone user;

- Evidence indicating the cellular phones user(s)'s state of mind as it relates to the Subject Offenses;

- Passwords, encryption keys and other access devices that may be necessary to access the cellular phones;

2

- Records of or information about the cellular phones' internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses, to the extent such information relates to the Subject Offenses; and

- Contextual information necessary to understand the evidence described in this attachment.

For the cellular phone(s) described in subsection (j), to the extent such cellular phone(s) were recovered from a bedroom identified as one in which EDMUND EICHENAUER had been sleeping or which rang when agents called the number (718) 568-6829, this warrant authorizes law enforcement personnel to: press or swipe the fingers (including thumbs) of EDMUND EICHENAUER against the fingerprint scanner of a cellular phone with a biometric unlocking feature; hold EDMUND EICHENAUER in place while holding a cellular phone with a biometric unlocking feature in front of his face to activate the facial recognition feature; and/or hold EDMUND EICHENAUER in place while holding a cellular phone with a biometric unlocking feature in front of his face to activate the iris recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant. Law enforcement officers will select which fingers (including thumbs) to press to the cellular phones.

For the cellular phone(s) described in subsection (h), to the extent such cellular phone(s) were recovered from a bedroom identified as one in which GEORGE EICHENAUER had been sleeping or which rang when agents called the number (347) 545-2109, this warrant authorizes law enforcement personnel to: press or swipe the fingers (including thumbs) of GEORGE EICHENAUER against the fingerprint scanner of a cellular phone with a biometric

3

unlocking feature; hold GEORGE EICHENAUER in place while holding a cellular phone with a biometric unlocking feature in front of his face to activate the facial recognition feature; and/or hold GEORGE EICHENAUER in place while holding a cellular phone with a biometric unlocking feature in front of his face to activate the iris recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant. Law enforcement officers will select which fingers (including thumbs) to press to the cellular phones.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigative agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## ATTACHMENT A-5

*Person to Be Searched*

The person of ARCANGELO CAFARO (DOB: March 14, 1976).  A photograph of CAFARO is copied below.



## ATTACHMENT B-5

*Property to Be Seized*

This warrant authorizes the seizure of evidence, contraband, fruits and instrumentalities relating to violations of Title 21, United States Code, Sections 841 and 846 (narcotics trafficking and conspiracy to traffic narcotics) and Title 18, United States Code, Section 1956 (money laundering) (collectively, the "Subject Offenses") involving ARCANGELO CAFARO, JOSE COSTA, RICARDO DIAZ, EDMUND EICHENAUER, GEORGE EICHENAUER, JAY SANCHEZ, or their co-conspirators and associates between December 1, 2020 to the present, including:

a. Narcotics or other controlled substances;

b. Drug paraphernalia, including, but not limited to, scales, baggies, and instruments that may be used to press narcotics into pills or tightly compacted quantities;

c. Proceeds of narcotics trafficking, including U.S. currency and financial instruments;

d. Lists of narcotics customers and related identifying information;

e. Types, amounts, and prices of drugs trafficked, as well as dates, places, and amounts of specific transactions;

f. Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

g. All bank records, checks, credit card bills, account information, and other financial records, to the extent such information relates to the Subject Offenses;

h. Any cellular phone on ARCANGELO CAFARO's person or in his immediate reach, and any cellular phone that rings when agents call (646) 740-3480. Cellular phones seized in the aforementioned ways may be searched for the purpose of identifying the following:

- Records and information relating to subsections (a) through (g) above;

- Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received by the cellular phones and which relate to the Subject Offenses;

- Evidence of who used, owned, or controlled the cellular phones at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

- Photographs, videos, and other stored media that relates to the Subject Offenses;

- Evidence that the cellular phones were used as instrumentalities of the Subject Offenses;

- Evidence indicating how and when the cellular phones were accessed or used to determine the chronological context of cellular-phone access, use, and events relating to the Subject Offenses and the cellular phone user;

- Evidence indicating the cellular phones user(s)'s state of mind as it relates to the Subject Offenses;

- Passwords, encryption keys and other access devices that may be necessary to access the cellular phones;

- Records of or information about the cellular phones' internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses, to the extent such information relates to the Subject Offenses; and

- Contextual information necessary to understand the evidence described in this attachment.

For the cellular phones described in subsection (h), this warrant authorizes law enforcement personnel to: press or swipe the fingers (including thumbs) of ARCANGELO CAFARO against the fingerprint scanner of a cellular phone with a biometric unlocking feature;

2

hold ARCANGELO CAFARO in place while holding a cellular phone with a biometric unlocking feature in front of his face to activate the facial recognition feature; and/or hold ARCANGELO CAFARO in place while holding a cellular phone with a biometric unlocking feature in front of his face to activate the iris recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant. Law enforcement officers will select which fingers (including thumbs) to press to the cellular phones.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigative agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## ATTACHMENT A-6

*Person to Be Searched*

The person of JOSE COSTA (DOB: November 7, 1979).  A photograph of

COSTA is copied below.



**ATTACHMENT B-6**

*Property to Be Seized*

This warrant authorizes the seizure of evidence, contraband, fruits and

instrumentalities relating to violations of Title 21, United States Code, Sections 841 and 846

(narcotics trafficking and conspiracy to traffic narcotics) and Title 18, United States Code,

Section 1956 (money laundering) (collectively, the "Subject Offenses") involving

ARCANGELO CAFARO, JOSE COSTA, RICARDO DIAZ, EDMUND EICHENAUER,

GEORGE EICHENAUER, JAY SANCHEZ, or their co-conspirators and associates between

December 1, 2020 to the present, including:

a. Narcotics or other controlled substances;

b. Drug paraphernalia, including, but not limited to, scales, baggies, and instruments that may be used to press narcotics into pills or tightly compacted quantities;

c. Proceeds of narcotics trafficking, including U.S. currency and financial instruments;

d. Lists of narcotics customers and related identifying information;

e. Types, amounts, and prices of drugs trafficked, as well as dates, places, and amounts of specific transactions;

f. Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

g. All bank records, checks, credit card bills, account information, and other financial records, to the extent such information relates to the Subject Offenses;

h. Any cellular phone on JOSE COSTA's person or in his immediate reach, and any cellular phone that rings when agents call (718) 207-8238.  Cellular phones seized in the aforementioned ways may be searched for the purpose of identifying the following:

- Records and information relating to subsections (a) through (g) above;

2

- Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received by the cellular phones and which relate to the Subject Offenses;

- Evidence of who used, owned, or controlled the cellular phones at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

- Photographs, videos, and other stored media that relates to the Subject Offenses;

- Evidence that the cellular phones were used as instrumentalities of the Subject Offenses;

- Evidence indicating how and when the cellular phones were accessed or used to determine the chronological context of cellular-phone access, use, and events relating to the Subject Offenses and the cellular phone user;

- Evidence indicating the cellular phones user(s)'s state of mind as it relates to the Subject Offenses;

- Passwords, encryption keys and other access devices that may be necessary to access the cellular phones;

- Records of or information about the cellular phones' internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses, to the extent such information relates to the Subject Offenses; and

- Contextual information necessary to understand the evidence described in this attachment.

For the cellular phones described in subsection (h), this warrant authorizes law enforcement personnel to: press or swipe the fingers (including thumbs) of JOSE COSTA against the fingerprint scanner of a cellular phone with a biometric unlocking feature; hold JOSE

COSTA in place while holding a cellular phone with a biometric unlocking feature in front of his face to activate the facial recognition feature; and/or hold JOSE COSTA in place while holding a cellular phone with a biometric unlocking feature in front of his face to activate the iris recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.  Law enforcement officers will select which fingers (including thumbs) to press to the cellular phones.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigative agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

**ATTACHMENT A-7**

*Person to Be Searched*

The person of RICARDO DIAZ (DOB: July 19, 1980).  A photograph of

RICARDO DIAZ is copied below.



**ATTACHMENT B-7**

*Property to Be Seized*

This warrant authorizes the seizure of evidence, contraband, fruits and instrumentalities relating to violations of Title 21, United States Code, Sections 841 and 846 (narcotics trafficking and conspiracy to traffic narcotics) and Title 18, United States Code, Section 1956 (money laundering) (collectively, the "Subject Offenses") involving ARCANGELO CAFARO, JOSE COSTA, RICARDO DIAZ, EDMUND EICHENAUER, GEORGE EICHENAUER, JAY SANCHEZ, or their co-conspirators and associates between December 1, 2020 to the present, including:

a. Narcotics or other controlled substances;

b. Drug paraphernalia, including, but not limited to, scales, baggies, and instruments that may be used to press narcotics into pills or tightly compacted quantities;

c. Proceeds of narcotics trafficking, including U.S. currency and financial instruments;

d. Lists of narcotics customers and related identifying information;

e. Types, amounts, and prices of drugs trafficked, as well as dates, places, and amounts of specific transactions;

f. Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

g. All bank records, checks, credit card bills, account information, and other financial records, to the extent such information relates to the Subject Offenses;

h. Any cellular phone on RICARDO DIAZ's person or in his immediate reach, and any cellular phone that rings when agents call (347) 753-5648. Cellular phones seized in the aforementioned ways may be searched for the purpose of identifying the following:

- Records and information relating to subsections (a) through (g) above;

2

- Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received by the cellular phones and which relate to the Subject Offenses;

- Evidence of who used, owned, or controlled the cellular phones at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

- Photographs, videos, and other stored media that relates to the Subject Offenses;

- Evidence that the cellular phones were used as instrumentalities of the Subject Offenses;

- Evidence indicating how and when the cellular phones were accessed or used to determine the chronological context of cellular-phone access, use, and events relating to the Subject Offenses and the cellular phone user;

- Evidence indicating the cellular phones user(s)'s state of mind as it relates to the Subject Offenses;

- Passwords, encryption keys and other access devices that may be necessary to access the cellular phones;

- Records of or information about the cellular phones' internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses, to the extent such information relates to the Subject Offenses; and

- Contextual information necessary to understand the evidence described in this attachment.

For the cellular phones described in subsection (h), this warrant authorizes law enforcement personnel to: press or swipe the fingers (including thumbs) of RICARDO DIAZ against the fingerprint scanner of a cellular phone with a biometric unlocking feature; hold

3

RICARDO DIAZ in place while holding a cellular phone with a biometric unlocking feature in front of his face to activate the facial recognition feature; and/or hold RICARDO DIAZ in place while holding a cellular phone with a biometric unlocking feature in front of his face to activate the iris recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.  Law enforcement officers will select which fingers (including thumbs) to press to the cellular phones.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigative agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## ATTACHMENT A-8

*Person to Be Searched*

The person of EDMUND EICHENAUER (DOB: June 23, 1979).  A photograph of EDMUND EICHENAUER is copied below.



**ATTACHMENT B-8**

*Property to Be Seized*

This warrant authorizes the seizure of evidence, contraband, fruits and

instrumentalities relating to violations of Title 21, United States Code, Sections 841 and 846

(narcotics trafficking and conspiracy to traffic narcotics) and Title 18, United States Code,

Section 1956 (money laundering) (collectively, the "Subject Offenses") involving

ARCANGELO CAFARO, JOSE COSTA, RICARDO DIAZ, EDMUND EICHENAUER,

GEORGE EICHENAUER, JAY SANCHEZ, or their co-conspirators and associates between

December 1, 2020 to the present, including:

   a. Narcotics or other controlled substances;

   b. Drug paraphernalia, including, but not limited to, scales, baggies, and instruments that may be used to press narcotics into pills or tightly compacted quantities;

   c. Proceeds of narcotics trafficking, including U.S. currency and financial instruments;

   d. Lists of narcotics customers and related identifying information;

   e. Types, amounts, and prices of drugs trafficked, as well as dates, places, and amounts of specific transactions;

   f. Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

   g. All bank records, checks, credit card bills, account information, and other financial records, to the extent such information relates to the Subject Offenses;

   h. Any cellular phone on EDMUND EICHENAUER's person or in his immediate reach, and any cellular phone that rings when agents call (718) 568-6829.  Cellular phones seized in the aforementioned ways may be searched for the purpose of identifying the following:

   • Records and information relating to subsections (a) through (g) above;

- Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received by the cellular phones and which relate to the Subject Offenses;

- Evidence of who used, owned, or controlled the cellular phones at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

- Photographs, videos, and other stored media that relates to the Subject Offenses;

- Evidence that the cellular phones were used as instrumentalities of the Subject Offenses;

- Evidence indicating how and when the cellular phones were accessed or used to determine the chronological context of cellular-phone access, use, and events relating to the Subject Offenses and the cellular phone user;

- Evidence indicating the cellular phones user(s)'s state of mind as it relates to the Subject Offenses;

- Passwords, encryption keys and other access devices that may be necessary to access the cellular phones;

- Records of or information about the cellular phones' internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses, to the extent such information relates to the Subject Offenses; and

- Contextual information necessary to understand the evidence described in this attachment.

For the cellular phones described in subsection (h), this warrant authorizes law enforcement personnel to: press or swipe the fingers (including thumbs) of EDMUND EICHENAUER against the fingerprint scanner of a cellular phone with a biometric unlocking

2

feature; hold EDMUND EICHENAUER in place while holding a cellular phone with a biometric unlocking feature in front of his face to activate the facial recognition feature; and/or hold EDMUND EICHENAUER in place while holding a cellular phone with a biometric unlocking feature in front of his face to activate the iris recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.  Law enforcement officers will select which fingers (including thumbs) to press to the cellular phones.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigative agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

3

## ATTACHMENT A-9

*Person to Be Searched*

The person of GEORGE EICHENAUER (DOB: May 5, 1978).  A photograph of

GEORGE EICHENAUER is copied below.



**ATTACHMENT B-9**

*Property to Be Seized*

This warrant authorizes the seizure of evidence, contraband, fruits and

instrumentalities relating to violations of Title 21, United States Code, Sections 841 and 846

(narcotics trafficking and conspiracy to traffic narcotics) and Title 18, United States Code,

Section 1956 (money laundering) (collectively, the "Subject Offenses") involving

ARCANGELO CAFARO, JOSE COSTA, RICARDO DIAZ, EDMUND EICHENAUER,

GEORGE EICHENAUER, JAY SANCHEZ, or their co-conspirators and associates between

December 1, 2020 to the present, including:

    a. Narcotics or other controlled substances;

    b. Drug paraphernalia, including, but not limited to, scales, baggies, and instruments that may be used to press narcotics into pills or tightly compacted quantities;

    c. Proceeds of narcotics trafficking, including U.S. currency and financial instruments;

    d. Lists of narcotics customers and related identifying information;

    e. Types, amounts, and prices of drugs trafficked, as well as dates, places, and amounts of specific transactions;

    f. Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

    g. All bank records, checks, credit card bills, account information, and other financial records, to the extent such information relates to the Subject Offenses;

    h. Any cellular phone on GEORGE EICHENAUER's person or in his immediate reach, and any cellular phone that rings when agents call (347) 545-2109. Cellular phones seized in the aforementioned ways may be searched for the purpose of identifying the following:

        • Records and information relating to subsections (a) through (g) above;

- Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received by the cellular phones and which relate to the Subject Offenses;

- Evidence of who used, owned, or controlled the cellular phones at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

- Photographs, videos, and other stored media that relates to the Subject Offenses;

- Evidence that the cellular phones were used as instrumentalities of the Subject Offenses;

- Evidence indicating how and when the cellular phones were accessed or used to determine the chronological context of cellular-phone access, use, and events relating to the Subject Offenses and the cellular phone user;

- Evidence indicating the cellular phones user(s)'s state of mind as it relates to the Subject Offenses;

- Passwords, encryption keys and other access devices that may be necessary to access the cellular phones;

- Records of or information about the cellular phones' internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses, to the extent such information relates to the Subject Offenses; and

- Contextual information necessary to understand the evidence described in this attachment.

For the cellular phones described in subsection (h), this warrant authorizes law enforcement personnel to: press or swipe the fingers (including thumbs) of GEORGE EICHENAUER against the fingerprint scanner of a cellular phone with a biometric unlocking

feature; hold GEORGE EICHENAUER in place while holding a cellular phone with a biometric

unlocking feature in front of his face to activate the facial recognition feature; and/or hold

GEORGE EICHENAUER in place while holding a cellular phone with a biometric unlocking

feature in front of his face to activate the iris recognition feature, for the purpose of attempting to

unlock the device in order to search the contents as authorized by this warrant.  Law enforcement

officers will select which fingers (including thumbs) to press to the cellular phones.

   As used above, the terms "records" and "information" include all of the foregoing

items of evidence in whatever form and by whatever means they may have been created or

stored, including any form of computer or electronic storage (such as flash memory or other

media that can store data) and any photographic form.

   This warrant authorizes a review of electronic storage media and electronically

stored information seized or copied pursuant to this warrant in order to locate evidence, fruits,

and instrumentalities described in this warrant.  The review of this electronic data may be

conducted by any government personnel assisting in the investigation, who may include, in

addition to law enforcement officers and agents, attorneys for the government, attorney support

staff, and technical experts.  Pursuant to this warrant, the investigative agency may deliver a

complete copy of the seized or copied electronic data to the custody and control of attorneys for

the government and their support staff for their independent review.

## ATTACHMENT A-10

*Person to Be Searched*

The person of JAY SANCHEZ (DOB: March 10, 1987).  A photograph of JAY SANCHEZ is copied below.



**ATTACHMENT B-10**

*Property to Be Seized*

This warrant authorizes the seizure of evidence, contraband, fruits and

instrumentalities relating to violations of Title 21, United States Code, Sections 841 and 846

(narcotics trafficking and conspiracy to traffic narcotics) and Title 18, United States Code,

Section 1956 (money laundering) (collectively, the "Subject Offenses") involving

ARCANGELO CAFARO, JOSE COSTA, RICARDO DIAZ, EDMUND EICHENAUER,

GEORGE EICHENAUER, JAY SANCHEZ, or their co-conspirators and associates between

December 1, 2020 to the present, including:

     a.  Narcotics or other controlled substances;

     b.  Drug paraphernalia, including, but not limited to, scales, baggies, and
instruments that may be used to press narcotics into pills or tightly compacted
quantities;

     c.  Proceeds of narcotics trafficking, including U.S. currency and financial
instruments;

     d.  Lists of narcotics customers and related identifying information;

     e.  Types, amounts, and prices of drugs trafficked, as well as dates, places, and
amounts of specific transactions;

     f.  Any information related to sources of drugs (including names, addresses,
phone numbers, or any other identifying information);

     g.  All bank records, checks, credit card bills, account information, and other
financial records, to the extent such information relates to the Subject
Offenses;

     h.  Any cellular phone on JAY SANCHEZ's person or in his immediate reach,
and any cellular phone that rings when agents call (347) 267-6569.  Cellular
phones seized in the aforementioned ways may be searched for the purpose of
identifying the following:

        •  Records and information relating to subsections (a) through (g) above;

- Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received by the cellular phones and which relate to the Subject Offenses;

- Evidence of who used, owned, or controlled the cellular phones at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

- Photographs, videos, and other stored media that relates to the Subject Offenses;

- Evidence that the cellular phones were used as instrumentalities of the Subject Offenses;

- Evidence indicating how and when the cellular phones were accessed or used to determine the chronological context of cellular-phone access, use, and events relating to the Subject Offenses and the cellular phone user;

- Evidence indicating the cellular phones user(s)'s state of mind as it relates to the Subject Offenses;

- Passwords, encryption keys and other access devices that may be necessary to access the cellular phones;

- Records of or information about the cellular phones' internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses, to the extent such information relates to the Subject Offenses; and

- Contextual information necessary to understand the evidence described in this attachment.

For the cellular phones described in subsection (h), this warrant authorizes law enforcement personnel to: press or swipe the fingers (including thumbs) of JAY SANCHEZ against the fingerprint scanner of a cellular phone with a biometric unlocking feature; hold JAY

2

SANCHEZ in place while holding a cellular phone with a biometric unlocking feature in front of his face to activate the facial recognition feature; and/or hold JAY SANCHEZ in place while holding a cellular phone with a biometric unlocking feature in front of his face to activate the iris recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.  Law enforcement officers will select which fingers (including thumbs) to press to the cellular phones.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigative agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

**EXHIBIT A**

SK:ADW/TBM
F. #2021R00370 / OCDETF#NY-NYE-0906

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

–  –  –  –  –  –  –  –  –  –  –  –  – X

UNITED STATES OF AMERICA

    - against -

ARCANGELO CAFARO,
JOSE COSTA,
RICARDO DIAZ,
EDMUND EICHENAUER and
JAY SANCHEZ,

                Defendants.

–  –  –  –  –  –  –  –  –  –  –  –  – X

<u>TO BE FILED UNDER SEAL</u>

<u>COMPLAINT AND AFFIDAVIT
IN SUPPORT OF
ARREST WARRANTS</u>

Case No. 22 MJ 43

(21 U.S.C. § 846)

EASTERN DISTRICT OF NEW YORK, SS:

      SCOTT SALAMON, being duly sworn, deposes and states that he is a Special

Agent with the United States Department of Homeland Security, Homeland Security

Investigations, duly appointed according to law and acting as such.

      Upon information and belief, in or about and between December 2020 and January

2022, both dates being approximate and inclusive, within the Eastern District of New York and

elsewhere, the defendants ARCANGELO CAFARO, JOSE COSTA, RICARDO DIAZ,

EDMUND EICHENAUER and JAY SANCHEZ, together with others, did knowingly and

intentionally conspire to distribute and possess with intent to distribute a controlled substance

containing cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1).

      (Title 21, United States Code, Section 846)

The source of your deponent's information and the grounds for his belief are as follows:[1]

1.      I am a Special Agent with the United States Department of Homeland Security, Homeland Security Investigations ("HSI").   I have been an HSI Special Agent since 2006 and am currently assigned to the Violent Crimes and Narcotics Group, where I investigate violations of the Controlled Substances Act and various related statutes.

2.      During my tenure with HSI, I have been involved with investigations of Title 21 offenses and have participated in numerous investigations of narcotics trafficking, during which I have (a) conducted physical surveillance, (b) executed search warrants, (c) debriefed cooperating witnesses and victims, (d) reviewed and analyzed numerous taped conversations of those engaged in narcotics trafficking and money laundering activities, and (e) monitored wiretapped conversations and reviewed line sheets prepared by wiretap monitors.   Through my training, education, and experience, I have become familiar with the manner in which narcotics trafficking schemes are carried out, and the efforts of persons involved in such activity to avoid detection by law enforcement.

3.      I am currently participating in an investigation of a narcotics distribution conspiracy concerning defendants ARCANGELO CAFARO, JOSE COSTA, RICARDO DIAZ, EDMUND EICHENAUER and JAY SANCHEZ (collectively, the "Target Subjects") and their co-conspirators.   I am familiar with the facts and circumstances set forth below through my participation in this investigation.   The facts set forth in this Affidavit are based, in part, on information that I have learned from the review of written documents prepared by, and

[1]  Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

conversations with, members of HSI, the United States Postal Service Office of Inspector General, New York City Police Department, and other law enforcement agencies; interviews with a cooperating witness ("CW"); interception of wire and electronic communications; surveillance; and review of various documents obtained by subpoenas.   Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.   All referenced transcripts are in draft form.

   4. As set forth below, the defendants operate and assist a drug trafficking organization—the Costa Organization—which operates out of Queens and Long Island, New York, and which distributes retail and wholesale quantities of cocaine to customers in the New York area and surrounding states.   The Costa Organization has obtained millions of dollars in proceeds from its cocaine sales, which proceeds were used to purchase real estate and luxury vehicles, among other things.   The Costa Organization maintains a stash house in Howard Beach, New York.

   5. COSTA is the leader of the Costa Organization, procuring wholesale quantities of cocaine from several different suppliers, including SANCHEZ, who supplies the Costa Organization with cocaine from Mexico.   COSTA and other members of the Costa Organization, including DIAZ, EICHENAUER and CAFARO, then personally sell that cocaine to customers in and around the New York area.   Both DIAZ and EICHENAUER manage day-to-day operations: DIAZ maintains a schedule of when members of the Costa Organization, such as CAFARO, will work selling cocaine and how much they earn during a given shift, and EICHENAUER keeps records of the supply of drugs remaining in the stash house and the volume of sales conducted daily, in addition to collecting and distributing the narcotics proceeds.

## **PROBABLE CAUSE**

6.     In late 2020, HSI learned from a reliable cooperating witness (the "CW")

that DIAZ was a member of a drug trafficking organization, the Costa Organization, that was

distributing cocaine in Queens, New York.[2]   Through its investigation, law enforcement learned

that CAFARO, COSTA, and EICHENAUER were also all members of the Costa Organization,

and that SANCHEZ regularly supplied cocaine to the Costa Organization.

7.     During the period between December 2020 and through 2021, at the

direction of law enforcement, the CW communicated with DIAZ via telephone calls and text

messages to arrange for narcotics transactions.   On numerous occasions during this period, the

CW arranged to meet with DIAZ and/or an associate of DIAZ at one or more locations in Queens,

New York to purchase cocaine.   In total, the CW purchased more than 500 grams of a white

powdery substance as part of these transactions.   Each transaction was recorded and surveilled by

law enforcement.   After each transaction, the CW provided the white powdery substance to law

enforcement, and on each occasion, the substance later tested positive for cocaine.

8.     Between October 2021 and December 2021, the Honorable Rachel P.

Kovner, United States District Judge, Eastern District of New York, issued orders authorizing the

interception of wire and electronic communications occurring over cell phones used by COSTA,

DIAZ, and EICHENAUER.   Law enforcement confirmed the identities of the users of the cell

phones through subscriber records, surveillance, and communications during which the speakers

identified themselves.   The intercepted communications, in combination with surveillance,

---

[2] The CW is an individual who pled guilty in New York state court to narcotics offenses and is cooperating in the hopes of receiving leniency at sentencing.   The CW has provided reliable information in the past, much of which has been corroborated by consensually recorded phone calls and text messages, law enforcement surveillance and other independent evidence.

revealed an extensive cocaine distribution operation and the locations of several properties where the Costa Organization appears to maintain narcotics and narcotics proceeds.

        9.     Intercepted communications show COSTA sourcing cocaine for the Costa Organization and SANCHEZ serving as one of the organization's suppliers.   During these communications, the defendants refer to kilograms of cocaine as "shits," among other code names.   For example, on or about November 12, 2021, COSTA and SANCHEZ had the following exchange during a phone call:

| | |
|---|---|
| SANCHEZ: | [. . .] he got a package, six of them shits came in and at twenty, usually charge for twenty-eight. |
| COSTA: | That's where I'm at, right now.   That's what I was telling you, last time. |
| SANCHEZ: | Yeah? |
| COSTA: | Everybody is there, bro.   That's why—that's why it's been dead, when you know—I still got those three here. |
| [ . . . ] | |
| COSTA: | I told you, you know what happened?   When all of that was stopped over there at the border, they—the farms don't stop.   You know what I'm saying? So . . . |
| SANCHEZ: | Mm-hmm, mm-hmm. |
| COSTA: | The farms keep going.   So, now they're unloading everything.   And it's crazy.   It's—those right there, I've been dead, dead in the water.   I'm like, "damn." |
| [ . . . ] | |
| COSTA: | I was in the teens at one time, like nineteen, eighteen. |
| SANCHEZ: | Oh yeah, yeah.   That thing, I was a kid when that was happening. |
| COSTA: | That was in the 2000s. |
| SANCHEZ: | Exactly. |

| COSTA: | Early 2000s. |
|---|---|

[ . . . ]

| SANCHEZ: | And they're pretty, and that's why I was like, "Oh yeah, he gonna like these shits." |
|---|---|
| COSTA: | Yeah.   [U/I] |
| SANCHEZ: | Them shits even got the—them shits got the, the fucking newspaper from— |
| COSTA: | Yeah, I believe you. |
| SANCHEZ: | Mexico and shit.   You know what I'm saying? |
| COSTA: | Yeah.   I believe you.   Um, just give me like a good two weeks, and then, I'm gonna fucking—and then [U/I] |
| SANCHEZ: | You tell me what's up. |
| COSTA: | Yeah, you know, I did—I'll do what I gotta do.   A good two weeks, I should have . . . at least most of it. |

Based on my training and experience, as well as the information I have learned from this investigation, I understand the above conversation as follows: SANCHEZ told COSTA that SANCHEZ had six kilograms of cocaine that he purchased at $20,000 per kilogram; SANCHEZ and COSTA discussed the fact that wholesale prices of cocaine were unusually low because although street-level sales had been slow ("it's been dead"), cocaine was still entering the market from Mexico ("When all of that was stopped over there at the border, they—the farms don't stop . . . now they're unloading everything"); SANCHEZ informed COSTA that the cocaine he had for sale was packaged in Mexican newspapers; and COSTA told SANCHEZ he would likely be in a position to purchase the cocaine in approximately two weeks ("A good two weeks").

      10.     On November 15, 2021, at approximately 5:01 p.m., COSTA and SANCHEZ had the following exchange over an intercepted phone call:

| COSTA: | One of my boys just hit me for one of those. |
|---|---|
| SANCHEZ: | Okay.   When you want it?   Right now? |
| COSTA: | I'm trying to see him tomorrow you know, tomorrow.   Or—uh, you know? |
| SANCHEZ: | Tomorrow, could be—Nah, that's what I'm saying, I'll go—you already know I'll go over there early in the morning, I'll go . . . just drop it off.   [U/I] |
| COSTA: | You gotta come before the cleaning ladies come here.   Cuz they get here by—oh shit, I'm gonna have somebody here doing my floor. Uh . . . |
| SANCHEZ: | I'll see.   I might try—I might try to go today.   I'mma try to go today.   [U/I] |
| COSTA: | Try to make it today.   So, I can bang this guy out of the way before he goes somewhere else. |

Based on my training and experience, and the information I have learned in this investigation, I understand the above conversation as follows: COSTA informed SANCHEZ that he had found a customer for the cocaine SANCHEZ was trying to sell, and accordingly that COSTA wanted to buy the cocaine from SANCHEZ; and COSTA asked SANCHEZ to deliver the cocaine to him that night, as opposed to the next day when COSTA intended to see the customer, because COSTA was expecting that the next morning he would have cleaning people and an individual doing work on his floors in his home.

11.     Video surveillance showed that later that evening, at approximately 11:30 p.m., SANCHEZ arrived at COSTA's house in a black vehicle.   SANCHEZ exited the car, leaned into the driver's side, retrieved an item from inside the car, and then walked through the garage door of COSTA's residence, which was open.   Approximately ten minutes later, SANCHEZ exited the garage door of COSTA's residence carrying a bag.   SANCHEZ walked to the driver's side door of his vehicle, leaned inside the driver's side area, and then entered the car.

COSTA exited the garage door of his residence and walked to the front passenger's side of SANCHEZ's vehicle.   COSTA walked back through the garage door of his residence and the garage door closed.   SANCHEZ drove away.

12.    On December 28, 2021, at approximately 10:16 a.m., SANCHEZ said the following to COSTA during an intercepted phone call:

SANCHEZ:         My fault, I didn't get to see you that day, man.   I crashed my jeep.
                 That's why I haven't been hitting you up…

[ . . . ]

SANCHEZ:         I was gonna see you tomorrow, with the same shit.   You already
                 know. [ . . . ]   So, I'll be there tomorrow.

Based on my training and experience and the investigation to date, I understand the above conversation as follows: COSTA and SANCHEZ agreed to meet on December 29, 2021, so that SANCHEZ could deliver cocaine to COSTA.

13.    Video surveillance showed that the next day, on December 29, 2021, at approximately 10:00 a.m., SANCHEZ left his residence carrying a black bag, entered a vehicle parked in the vicinity, and drove out of view.   At approximately 10:16 a.m., SANCHEZ drove back to his residence in the same vehicle.   At approximately 10:18 a.m., SANCHEZ exited the vehicle while talking on a cell phone, opened the front passenger door, retrieved a weighted down black bag from inside, and walked towards the front of his residence.   At approximately 10:20 a.m., while still talking on a cell phone, SANCHEZ walked out the front gate of his residence, without a bag in hand, and out of view.   At approximately 10:25 a.m., SANCHEZ walked back towards the entrance to his residence, still on a cell phone.   At approximately 10:40 a.m., SANCHEZ exited the front gate of his residence with a weighted down black bag and entered the driver's seat of his vehicle, before driving off.   At approximately 11:08 a.m., SANCEHZ arrived

at COSTA's residence and parked in the driveway.   SANCHEZ called COSTA at approximately

11:10 a.m., asking COSTA if he was "here" because SANCHEZ was "outside."   SANCHEZ

exited the car, opened the rear driver's side door, and appeared to be moving an object.   At

approximately 11:13 a.m., SANCHEZ re-entered the driver's seat.   At the same time, the garage

door of COSTA's residence opened, and COSTA appeared.   SANCHEZ exited the vehicle,

retrieved the weighted down black bag from the rear driver's side area, and entered the garage.

At approximately 11:25 a.m., SANCHEZ exited the garage carrying a green bag and a black bag,

and entered the driver's seat of his vehicle.   At around the same time, DIAZ exited COSTA's

garage, smoking a cigarette, and engaged in brief conversation with SANCHEZ before

SANCHEZ drove away.   At approximately 11:50 a.m., SANCHEZ returned to his house.

SANCHEZ retrieved the green bag and black bag from the car and entered his front door.

      14.    In addition to sourcing cocaine for the Costa Organization, COSTA is

responsible for managing drug supplies and proceeds for the organization.   EICHENAUER

assists COSTA with these tasks.   For example, on or about November 26, 2021, COSTA and

EICHENAUER had the following conversation over an intercepted phone call:

COSTA:           What we looking like over there?   Your brother still has?

EICHENAUER:      Yeah, he's got a lot still.

COSTA:           Oh.

EICHENAUER:      I think he's got thirteen.   So. . .

COSTA:           God damn!

EICHENAUER:      Yeah.   So, slow, slow go for him this week.

[. . .]

COSTA:           We still good with that then.   This kid gave you, uh, Little Jo',
                     everybody gave you everything?

| EICHENAUER: | I have . . . yeah, I got some bread that was on your shelf in there. It's like three or four diff. . . there's four different stacks. |
| COSTA: | A'ight.   Is Little Jo's there? |
| EICHENAUER: | I, I don't . . . |
| COSTA: | Oh, you don't know. |
| EICHENAUER: | Let me see if I see . . . if his names are on them shits.   I got Tank. |
| COSTA: | Uh-huh. |
| EICHENAUER: | Wednesday. |
| COSTA: | Wednesday, yeah. |
| EICHENAUER: | And then, the day before's bread, I believe. |
| COSTA: | Yeah, yeah. |
| EICHENAUER: | And then, there's a fourth stack in a plastic bag that looks like a lot. |
| COSTA: | Yeah, probably. . . Yeah, a'ight.   That's probably Lil Jo's. |
| EICHENAUER: | That must be Little Jo's, yeah. |
| COSTA: | A'ight.   I'm home.   Fucking . . . |
| EICHENAUER: | Yeah, I'll stop . . . I'm on the way.   So, I'll probably be there in like fif . . . twenty minutes. |
| COSTA: | A'right, cool.   Come out. |

Based on my training and experience, as well as the information I have learned from this investigation, I understand the above conversation as follows: COSTA asked EICHENAUER about the supply of narcotics still in EICHENAUER's brother's possession, and EICHENAUER indicated that EICHENAUER's brother still had a large supply left because of slow narcotics sales ("So, slow, slow go for him this week"); and COSTA and EICHENAUER discussed narcotics proceeds stored at a residence in Howard Beach, which the Costa Organization uses as a

stash house to store narcotics and narcotics proceeds, with reference to proceeds earned on specific days and attributable to particular members of the Costa Organization.

15.     Approximately 20 minutes after this phone call concluded, video surveillance revealed that EICHENAUER arrived at COSTA's home and parked in the driveway. The garage door opened, and EICHENAUER exited his car and entered the residence.   About one minute later, EICHENAUER exited the garage, closed the garage door, entered his car, and then drove away.

16.     Similarly, on December 31, 2021, at approximately 2:21 p.m., EICHENAUER and DIAZ had the following exchange over an intercepted phone call:

EICHENAUER:     Yo, I'mma come around and drop this butter.

DIAZ:     A'right, yeah, yeah.

EICHENAUER:     I'll call you when I'm out there, I'll be five minutes.

DIAZ:     A'right.   Yo, uh, so that was uh, yesterday's . . .

EICHENAUER:     And the day before, yeah.

DIAZ:      . . . and the day before?   Yeah, 'cause I was gonna pass by there, but then you read my mind.

Based on my training and experience, and the investigation to date, I understand the above conversation as follows: EICHENAUER informed DIAZ that EICHENAUER would be delivering to COSTA's house the narcotics proceeds, which he referred to as "butter," from the past two days' sales.

17.     Video surveillance revealed that at approximately 2:24 p.m. that same day, EICHENAUER arrived at COSTA's residence in a black vehicle.   DIAZ exited the garage door of the residence and walked to the front passenger window of EICHENAUER's car.   Afterward, EICHENAUER drove away.   DIAZ then walked to his white vehicle, which was parked in the

driveway of COSTA's residence, first opened and closed the front passenger door, then opened the driver's side door, leaned inside, and closed the door.   DIAZ then re-entered the garage door of COSTA's residence.

18.     Intercepted communications show DIAZ managing the Costa Organization's street-level sales and "runners"—i.e., individuals who deliver narcotics to customers.   For example, on or about October 15, 2021, at approximately 1:37 p.m., DIAZ had the following conversation with a customer whose surname begins with a "G" ("Customer 1"):

| | |
|---|---|
| Customer 1: | Can I get a ball? |
| DIAZ: | A'int not yet. |
| Customer 1: | Is it gonna be out by, like, 2:00? |
| DIAZ: | It should be. |
| Customer 1: | Alright.   Cool.   Send it over. |
| DIAZ: | Alright. |

At approximately 2:04 p.m., DIAZ then spoke with one of the Costa Organization's runners ("Co-Conspirator 1").   During that call, DIAZ said, "Big G, uh, he needs a biz."   Co-Conspirator 1 responded by saying he would "call him right now."   Based on my training and experience and the investigation to date, I understand the above two conversations to relate to Customer 1 calling DIAZ to purchase an eighth of an ounce of cocaine (an "eight ball" or a "ball") and DIAZ then calling Co-Conspirator 1 to direct him to handle the transaction (with DIAZ referring to Customer 1 as "Big G").   Based on other communications that have been intercepted in this investigation, I understand DIAZ's use of the word "biz" to be a code word for an eighth of an ounce of cocaine.

19.     Intercepted communications show that CAFARO distributes cocaine for the Costa Organization as a "runner," and DIAZ regularly instructs CAFARO on drug deliveries.

For example, on October 19, 2021, a drug customer ("Customer 2") spoke with DIAZ on the phone and asked for "50 of Frankie."   Based on my training and experience and the investigation to date, I understand "Frankie" to be a code word for cocaine.   About one minute later, DIAZ called CAFARO and said, "Malibu most wanted, 50 of Frankie."   Based on my training and experience and the investigation to date, I understand these conversations as follows: Customer 2 told DIAZ that Customer 2 wanted to buy $50 worth of cocaine; and DIAZ subsequently instructed CAFARO to deliver the drugs to Customer 2, referring to him as "Malibu most wanted."

        20.     The investigation has revealed that EICHENAUER communicates with runners, including CAFARO, to manage the distribution of cocaine and that EICHENAUER ensures that runners have enough cocaine on hand to sell to customers.   For example, on November 28, 2021, at approximately 1:19 p.m., EICHENAUER and CAFARO had the following exchange during an intercepted phone call:

EICHENAUER:     I just got over here.   What do you got left over there?

CAFARO:     Seventeen, one, twenty, eighteen.

EICHENAUER:     Seven.   Seventeen, one, twenty, and eighteen?

CAFARO:     Yeah.   Seventeen, number one . . . twenty, and eighteen.   We got one-five left.

EICHENAUER:     I gave you twenty . . .

CAFARO:     Huh?

EICHENAUER:     I gave you twenty sixes and twenty fours?

CAFARO:     No, no, no.   Uh . . .oh.   My bad, my bad.   I don't know why I said twenty.

EICHENAUER:     Oh, you mean ten and eight?

| | |
|---|---|
| CAFARO: | Yeah, yeah, yeah.   Ten and eight.   I don't know why I said . . . |
| EICHENAUER: | Ten and eight.   Okay.   I—yo, you threw me off for a second.   I'm like, "wait, I gave you that much?" |
| CAFARO: | No, I don't even know why I said that.   I was just . . . |
| EICHENAUER: | Yeah, ten and eight.   Okay. |
| CAFARO: | Yeah. |
| EICHENAUER: | 'Cause you used to get, you know . . . |
| CAFARO: | Yeah. |
| EICHENAUER: | . . . forty, forty, twenty, twenty.   So . . . a'right.   So, you're, you're good for two o'clock then. |
| CAFARO: | Gotchu, sir. |
| EICHENAUER: | A'right.   I'll see you in a few. |

Based on my training and experience, as well as the information I have learned from this investigation, I understand the above conversation as follows: EICHENAUER and CAFARO discussed the quantity of cocaine that was still in CAFARO's possession, based on what EICHENAUER had given to CAFARO earlier; and the two agreed to meet at the stash house in Howard Beach at approximately 2:00 p.m. so that EICHENAUER could give CAFARO more cocaine to be sold to customers.

21.     Video surveillance revealed that at approximately 2:02 p.m., CAFARO drove from his house to a residence in Howard Beach, New York, which, as noted above, the Costa Organization uses as a stash house.   At approximately 2:03 p.m., EICHENAUER walked down the driveway from the rear of the stash house towards CAFARO's car, carrying a large brown paper bag with the word "PETCO" on it.   EICHENAUER handed the bag to CAFARO through the driver's window.   EICHENAUER then walked back up the driveway to the stash

house, and CAFARO drove away.   At approximately 2:12 p.m., CAFARO returned to his

residence, exited his car with the brown PETCO bag, and walked inside his house.

22.    The investigation has further revealed that CAFARO assists COSTA in

making large-scale sales.   For example, on December 9, 2021, at approximately 8:27 p.m.,

CAFARO and COSTA had the following exchange during an intercepted phone call:

| | |
|---|---|
| COSTA: | That's a no go. |
| CAFARO: | Oh, no? |
| COSTA: | Nah, he tried it.   You know he's, he's a professional at that. |
| CAFARO: | Damn. |
| COSTA: | But I told him, just bring it back or . . . I'll just grab it.   So I'm gonna find out right now.   So . . . Just tell your boy he can come grab it anytime he wants. |
| CAFARO: | [Chuckles] |
| COSTA: | I tried!   You see I'm trying. |
| CAFARO: | Listen, I know. |
| COSTA: | I was [U/I] . . . |
| CAFARO: | [U/I] when I put the, when I put the, the um . . . the, the razor. |
| COSTA: | Yeah. |
| CAFARO: | It went—it went right in. |
| COSTA: | Yeah.   It's doo-doo.   Nah, they send you a waste of my time, but I tried. |
| CAFARO: | You tried. |
| COSTA: | I'm gonna throw you a few dollars.   Everybody make everybody happy.   But not good.   What you gonna do?   A'ight.   So, when you call, before you call him tomorrow, tell him the other . . .   Uh . . .   What's his name?   That other kid.   Be like, "Yo, just come grab it."   [U/I] |
| CAFARO: | Yeah, I'll call—I'll call him tomorrow morning. |

| COSTA: | You could tell him, "It's no good for the water." |
|---|---|
| CAFARO: | Yeah.   There's no rush. |
| COSTA: | I tried, I tried.   But say it like that, "No good for the water." |
| CAFARO: | A'ight. |

Based on my training and experience, and the investigation to date, including surveillance on the night in question, I understand the above conversation as follows: COSTA informed CAFARO that a potential customer was unwilling to purchase the cocaine he had recently picked up from CAFARO; COSTA admitted to CAFARO that the quality of the cocaine was poor; CAFARO stated that when he put a razor into the cocaine, the razor slipped right in, demonstrating the poor quality of the cocaine; and COSTA then asked CAFARO to attempt to return the cocaine to the individual from whom they procured it, and instructed CAFARO to tell that individual that the cocaine was "No good for the water," which I understand to be a reference to the unsuitability of the cocaine for the purpose of producing crack cocaine, which requires water.

WHEREFORE, your deponent respectfully requests that arrest warrants issue for the defendants ARCANGELO CAFARO, JOSE COSTA, RICARDO DIAZ, EDMUND EICHENAUER and JAY SANCHEZ, so that they may be dealt with according to law.   I further request that this affidavit and the arrest warrants be filed under seal, as premature disclosure of

this application would give the defendants an opportunity to destroy evidence, change patterns of

behavior, notify confederates, and flee or evade prosecution.

SCOTT M
SALAMON

Digitally signed by SCOTT M
SALAMON
Date: 2022.01.14 15:49:18 -05'00'

SCOTT SALAMON
Special Agent
United States Department of Homeland Security,
Homeland Security Investigations

Sworn to before me by telephone this
__ 14 day of January, 2022

*Vera M. Scanlon*

THE HONORABLE VERA M. SCANLON
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK